## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## NORTHERN DIVISION

**CAROLYN ARNETT**                                                          **PLAINTIFF**
**ADC # 706556**

**v.**                          **Case No. 3:21–cv–00088–KGB**

**LARRY NORRIS,** *et al.*                                      **ADC DEFENDANTS**

### OPINION AND ORDER

Before the Court is Arkansas Division of Correction ("ADC") defendants Larry Norris,

Wendy Kelley, Linda Dykes, Christopher Budnik, Ray Hobbs,[1] and Nurzuhal Faust's (collectively

"ADC Defendants") motion for summary judgment (Dkt. No. 38).  Plaintiff Carolyn Arnett has

responded in opposition, and ADC Defendants have filed a reply (Dkt. Nos. 48; 50).  For the

reasons discussed below, the Court grants, in part, and denies, in part, ADC Defendants' motion

for summary judgment (Dkt. No. 38).

### I.        Legal Claims Pending Against ADC Defendants

Ms. Arnett sues the ADC Defendants only in their individual capacities; there are no

official capacity claims raised (Dkt. No. 1, at 1).  Ms. Arnett asserts in count two of her complaint

against all defendants, including ADC Defendants, what she styles as a failure to protect, failure

to supervise, and retaliation claim pursuant to 42 U.S.C. § 1983, citing the Eighth and Fourteenth

Amendments (*Id.*, ¶¶ 210–219).  In count three, she asserts against ADC Defendants what she

styles as an action for permitting a pattern of widespread sexual misconduct at the McPherson Unit

of the ADC pursuant to 42 U.S.C. § 1983, again citing the Eighth and Fourteenth Amendments

---

[1] ADC Defendants refer to defendant "Ray" Hobbs, not "Roy," and the Clerk of Court is directed to update the docket to reflect the correct spelling of Mr. Hobbs' first name (Dkt. No. 38, at 1).

and claiming deliberate indifference, cruel and unusual punishment, and a loss of liberty (*Id.*, ¶¶ 220–230).  In count four, she asserts against all defendants, including ADC Defendants, a conspiracy to violate civil rights claim pursuant to 42 U.S.C. § 1985 (*Id.*, ¶¶ 231–233).

ADC Defendants move for summary judgment on all of Ms. Arnett's claims (Dkt. No. 38), and Ms. Arnett opposes the motion (Dkt. No. 48).  As alleged in her complaint, in Ms. Arnett's response to ADC Defendants' motion for summary judgment, she asserts that ADC Defendants violated her Eighth and Fourteenth Amendment rights when they failed to protect her from Mr. DeWitt and other prison staff, failed to supervise Mr. DeWitt and other staff, and retaliated against Ms. Arnett for exercising her constitutional rights when she reported Mr. DeWitt (*Id.*, at 1, 2).  Ms. Arnett also asserts that ADC Defendants perpetuated a facility–wide custom of concealing instances of staff misconduct and that ADC Defendants engaged in a civil conspiracy to interfere with the exercise of her constitutional rights (*Id.*).

## II.    Factual Background

Unless otherwise specified, the Court draws the following facts from the ADC Defendants' statement of undisputed material facts and Ms. Arnett's response to ADC Defendants' statement of undisputed material facts (Dkt. Nos. 40; 49).

Carolyn Arnett, ADC #706556 was an inmate of the Arkansas Division of Corrections ("ADC") housed at the McPherson Unit ("McPherson") at all times relevant to this action (Dkt. No. 49, ¶ 1).

Larry Norris was employed as the director of the ADC from December 1993 through January 2010, and the Interim Director of the ADC from November 2014 through January 2015 (*Id.*, ¶ 2).  Mr. Norris was not employed at the ADC from February 2010 through October 2014 (*Id.*, ¶ 3).  Mr. Norris worked in corrections for approximately 34 years (*Id.*, ¶ 4).

Wendy Kelley was employed as Deputy Director of the ADC from February 2006 through January 2014, Chief Deputy Director of the ADC from January 2014 through January 2015, Director of the ADC from February 2015 through June 2019, and Secretary of the Department of Corrections from July 2019 through July 2020 (*Id.*, ¶ 5).  As Deputy Director, Kelley was over Chaplaincy Services (*Id.*, ¶ 6).

ADC Defendants argue that, as Deputy Director, Kelley met with staff who reported to her regularly, required staff to submit monthly reports, reviewed their policies annually, engaged in unannounced visits when she got a complaint about something that was concerning, and routinely visited the units (*Id.*, ¶ 7).  Ms. Arnett admits only that this is Ms. Kelley's testimony (*Id.*).  ADC Defendants assert that Kelley was not over Chaplaincy Services as Chief Deputy Director (*Id.*, ¶ 8).  Ms. Arnett objects that this statement is vague and confusing and admits that Ms. Kelley was not directly over Chaplaincy Services (*Id.*).

ADC Defendants assert that Linda Dykes began working for the ADC in 2001 as a Sergeant at McPherson, was a Lieutenant at McPherson from 2009 to 2010, a Captain at McPherson from 2010 to February 2017, and a Deputy Warden at McPherson from February 2017 through June 2017 (*Id.*, ¶ 9).

ADC Defendants assert that Christopher Budnik has been employed by ADC for approximately 20 years and was a Deputy Warden at McPherson from June 2014 through August 2015 (*Id.*, ¶ 10).

Ray Hobbs was the Chief Deputy Director of the ADC from 2001 to January of 2010, the Interim Director of the ADC from January 2010 to June 2010, and the Director of the ADC from June 2010 to October 2014 when he retired (*Id.*, ¶ 11).  As Chief Deputy Director, McPherson was not one of the units Hobbs supervised (*Id*, ¶ 12).  ADC Defendants assert that as Chief Deputy

Director, Hobbs stayed apprised of what was going on at the prison facilities by visiting the units, talking to the wardens, and making unannounced visits to walk the units (*Id.*, ¶ 13).  Ms. Arnett denies this with citation to record evidence and argues that Mr. Hobbs was not even aware that ADC and Department of Justice ("DOJ") signed a MOA regarding the 2003 Civil Rights of Institutionalized Persons Act ("CRIPA") recommendations (*Id.*).  Mr. Hobbs worked in corrections for approximately 39 years (*Id.*, ¶ 14).

Nurzuhal Faust has worked for the ADC since 2001 and was employed as a Deputy Warden at McPherson from April 2009 to March 2015, and as the Warden at McPherson from July 2020 through the present (*Id.*, ¶ 15).

Kenneth DeWitt became the Chaplain at McPherson on July 1, 2001 (*Id.*, ¶ 16).  As a Unit Chaplain, Mr. DeWitt reported to the Administrator of Religious/Chaplaincy Services (*Id.*, ¶ 17). ADC Defendants assert that Ms. Kelley did not directly supervise Mr. DeWitt (*Id.*, ¶ 18).  Ms. Arnett states that she can neither admit nor deny this assertion (*Id.*).  ADC Defendants assert that the Administrator of Religious/Chaplaincy Services was responsible for making sure the unit chaplains' teachings were appropriate (*Id.*, ¶ 19).  Ms. Arnett denies this with citation to record evidence and asserts that Ms. Kelley was responsible and could have terminated Mr. Dewitt if she felt his teachings were inappropriate (*Id.*).

Mr. DeWitt's last day of employment with the ADC was September 10, 2014 (*Id.*, ¶ 20). ADC Defendants assert that Mr. DeWitt resigned his employment with the ADC in lieu of termination (*Id.*, ¶ 21).  Ms. Arnett admits this and adds that this allowed Mr. DeWitt to keep his state–funded pension despite engaging in felonious acts while working for the state and that it also allowed ADC to avoid increasing Prison Rape Elimination Act ("PREA") numbers (*Id.*)  ADC Defendants assert that allowing Mr. DeWitt to resign in lieu of termination did not violate ADC

policy (*Id.*, ¶ 22). Ms. Arnett denies this with citation to record evidence and asserts that the matter was not investigated despite prison policy (*Id.*, ¶ 22).

ADC Defendants assert that at the time of DeWitt's resignation, there were no allegations against him that implicated PREA (*Id.*, ¶ 23). Ms. Arnett denies this with citation to record evidence and argues that it was commonly known at the prison that Mr. Dewitt and Stacey Smith had a sexual relationship starting when Stacey Smith was an inmate (*Id.*). Stacey Smith was released from the ADC prior to 2005 (*Id.*, ¶ 24). ADC Defendants assert that Mr. DeWitt did not have a sexual relationship with Stacey Smith prior to her release from incarceration (*Id.*, ¶ 25). Ms. Arnett denies this with citation to record evidence and argues that it was commonly known at the prison that Mr. DeWitt and Stacey Smith had a sexual relationship starting when Stacey Smith was an inmate (*Id.*, ¶¶ 23, 25). ADC Defendants assert that Stacey Smith denied having a sexual relationship with Mr. DeWitt during the time she was an inmate (*Id.*, ¶ 26). Ms. Arnett admits that Stacey Smith was pressured to write the statement cited (and a second statement) but denies with citation to record evidence that there was no staff–inmate sexual relationship because it was commonly known at the prison that Mr. DeWitt and Stacey Smith had a sexual relationship starting when Stacey Smith was an inmate (*Id.*). ADC Defendants assert that Stacey Smith was an ADC volunteer in 2014 (*Id.*, ¶ 27). Ms. Arnett admits this and adds that volunteers are subject to duties to report and not to retaliate against protected activities (*Id.*).

ADC Defendants assert that plaintiff Carolyn Arnett engaged in sexual activity with Mr. DeWitt beginning in December 2010 (*Id.*, ¶ 28). Ms. Arnett admits that she was sexually abused beginning then (*Id*). ADC Defendants assert that the sexual activity occurred during the early morning hours during count time when Mr. DeWitt called Ms. Arnett to his office (*Id.*, ¶ 29). Ms. Arnett admits this but adds that the abuse occurred at the same time and same day of the week for

four years (*Id.*).  ADC Defendants assert that there is little inmate movement during count time (*Id.*, ¶ 30).  Ms. Arnett admits this but adds that there is much prison staff movement (*Id.*).  Ms. Arnett did not engage in sexual activity with Mr. DeWitt prior to December 2010 (*Id.*, ¶ 31).

ADC Defendants state that, at the time Mr. DeWitt resigned, Arnett had not told any of the ADC Defendants or any ADC employee that she had engaged in sexual activity with Mr. DeWitt and that the first time Ms. Arnett told anyone about her sexual activity with DeWitt was in December 2014 (*Id.*, ¶¶ 32–34).  Ms. Arnett admits this but adds that she was coerced by Mr. Dewitt, who told her that, if she reported his abuse, she would destroy the entire PAL[2] program (*Id.*, ¶¶ 32–34).

At the time Ms. Arnett reported the sexual activity with Mr. DeWitt, Mr. DeWitt had not been an employee of the ADC for over three months (*Id.*, ¶ 35).  ADC Defendants state that July 10, 2017, was the first time Ms. Arnett filed a grievance about the sexual activity with Mr. DeWitt (*Id.*, ¶ 36).  Ms. Arnett admits this but adds that the grievance prerequisite is only relevant to PLRA and that the state may not retaliate against protected activity (*Id.*).

ADC Defendants state that in December of 2014, Ms. Arnett told inmate Bobbie Nicholson that she had engaged in sexual activity with Mr. DeWitt (*Id.*, ¶ 37).  Ms. Arnett admits that she reported abuse to Ms. Nicholson (*Id.*).

ADC Defendants state that Jennifer Smith was a volunteer chaplain at the ADC in 2014 (*Id.*, ¶ 38).  Ms. Arnett admits this but adds that volunteers are subject to the duty to report (*Id.*).  ADC Defendants state that on Friday, December 19, 2014, Ms. Arnett told Jennifer Smith that she

---

[2] The Court notes that some filings in this case refer to the program as "PALS" rather "PAL."  The Court uses the acronym "PAL" throughout.

had engaged in sexual activity with Mr. DeWitt (*Id.*, ¶ 39). Ms. Arnett denies this with citation to record evidence and states that Jennifer Smith learned on December 18, 2014 (*Id.*).

ADC Defendants state that on Saturday, December 20, 2014, Jennifer Smith informed Administrator of Religious Services Don Yancey that Ms. Arnett reported she had engaged in sexual activity with Mr. DeWitt (*Id.*, ¶ 40). ADC Defendants state that on Sunday, December 21, 2014, Jennifer Smith emailed Mr. Yancey her statement documenting the conversation she had with Ms. Arnett regarding Ms. Arnett's sexual activity with Mr. DeWitt (*Id.*, ¶ 41). ADC Defendants state that on Sunday, December 21, 2014, Mr. Yancey forwarded Jennifer Smith's email statement to Chaplain Joshua Mayfield and Chaplain John Wheeler (*Id.*, ¶ 42). ADC Defendants state that on Sunday, December 21, 2014, Mr. Mayfield forwarded Jennifer Smith's email statement to Warden Jimmy Banks (*Id.*, ¶ 43). ADC Defendants state that Wendy Kelley learned of the allegations of Ms. Arnett's sexual activity with DeWitt sometime over the weekend of December 20–21, 2014 (*Id.*, ¶ 44). Ms. Arnett admits these statements but adds with citation to record evidence that there was more than one instance of delay in the reporting process regarding Mr. Dewitt's sexual abuse allegations (*Id.*, ¶¶ 40–44). Ms. Arnett states that Jennifer Smith delayed reporting, Mr. Yancey delayed reporting, Mr. Mayfield delayed reporting, and Mr. Naylor delayed notifying state police (*Id.*).

ADC Defendants state that on Monday, December 22, 2014, Mr. Yancey informed Jennifer Smith that an investigation would begin possibly that same day (*Id.*, ¶ 45). Ms. Arnett admits this but adds with citation to record evidence that the investigation started a week later on December 29, 2014, but it was instantly terminated and never completed (*Id.*). ADC Defendants state that on Monday, December 22, 2014, Mr. Mayfield forwarded Jennifer Smith's email statement to ADC Internal Affairs Administrator Raymond Naylor (*Id.*, ¶ 46). Ms. Arnett admits this but adds with

citation to record evidence that there was more than one instance of delay in the reporting process regarding Mr. Dewitt's sexual abuse allegations (*Id.*).  Ms. Arnett states that Jennifer Smith delayed reporting, Mr. Yancey delayed reporting, Mr. Mayfield delayed reporting, and Mr. Naylor delayed notifying state police (*Id.*).  ADC Defendants state that on Tuesday, December 23, 2014, Mr. Naylor advised his assistant to forward the allegations of sexual activity between Ms. Arnett and Mr. DeWitt to Arkansas State Police ("ASP") for prosecution (*Id.*, ¶ 47).  Ms. Arnett admits that the email reads as it reads but denies that the allegations were forwarded on December 23, 2014, as alleged by the ADC Defendants and further states that they were not forwarded until January 8, 2015, as evidenced by the ADC memo from Mr. Naylor referring the Mr. Dewitt allegations to ASP (*Id.*).

ADC Defendants state that on December 29, 2014, upon learning of the allegations, Mr. Faust instructed Ms. Dykes to get statements from Ms. Arnett and two other inmates regarding sexual activity with Mr. DeWitt (*Id.*, ¶ 48).  Ms. Arnett states that she can neither admit nor deny this statement (*Id.*).

ADC Defendants state that Mr. Naylor advised Mr. Faust that staff should not collect statements regarding the allegations of sexual activity because the matter was being referred to ASP, that ASP would collect their own statements for purposes of admissibility in court, and that, after speaking with Mr. Naylor, Mr. Faust advised Ms. Dykes to stop collecting witness statements because the matter was being turned over to internal affairs (*Id.*, ¶¶ 49, 50).  Ms. Arnett states that she can neither admit nor deny but adds with citation to record evidence that prison PREA investigations are separate and distinct from criminal investigations, that the state police conduct their own investigation, that the state police are not concerned about whether ADC policies were

violated, and that when cases go to the state police it does not mean that the state police handle the things the ADC is supposed to handle (*Id.*).

ADC Defendants state that Ms. Arnett began receiving mental health treatment in December 2014 (*Id.*, ¶ 51).  Ms. Arnett admits this but adds that said treatment was sporadic and frequently unavailable (*Id.*).

ADC Defendants state that prior to sending the file to ASP, Mr. Naylor advised ASP by phone of the allegations (*Id.*, ¶ 52).  Ms. Arnett denies this on the grounds that there is no objective or documentary evidence of this (*Id.*).  ADC Defendants state that on January 8, 2015, ADC Internal Affairs formally referred the allegations of sexual activity between Ms. Arnett and Mr. DeWitt to ASP (*Id.*, ¶ 53).  Ms. Arnett admits this but adds with citation to record evidence that the term "formally" is disingenuous because the evidence of record shows no other referral to ASP than the one on January 8, 2015, approximately 20 days after the allegations became known (*Id.*).

Mike Grimes was the ASP officer assigned to investigate the allegations of sexual assault on Ms. Arnett by Mr. DeWitt (*Id.*, ¶ 54).  ADC Defendants state that ADC staff cooperated fully in the ASP investigation into the sexual misconduct allegations against Mr. DeWitt (*Id.*, ¶ 55).  Ms. Arnett states that she can neither admit nor deny this (*Id.*).  ADC Defendants state that Mr. Grimes interviewed Ms. Arnett and others during his investigation (*Id.*, ¶ 56).  Ms. Arnett admits this but adds that Mr. Grimes did not question any ADC staff or Stacey Smith (*Id.*).

On March 12, 2015, Mr. Grimes interviewed Ms. Arnett at McPherson (*Id.*, ¶ 57).  On August 6, 2015, Grimes interviewed former inmate Bridgette Butler who stated there was never any inappropriate sexual contact between her and Mr. DeWitt (*Id.*, ¶ 58).

ADC Defendants state that, once an investigation is turned over to ASP, it is best practice that the witnesses not be interviewed by other agencies regarding the allegations ASP is

investigating while the ASP investigation is ongoing (*Id.*, ¶ 59). Ms. Arnett objects to this statement as vague and denies this statement with citation to record evidence stating that McPherson PREA policy required that all allegations of sexual abuse be investigated, that this was mandatory, and that per policy it is mandatory that Internal Affairs ("IA") investigators collect and preserve evidence and witness statements (*Id.*).

ADC Defendants state that the allegations against Mr. DeWitt were fully investigated by ASP and that, at the conclusion of the investigation, the findings were turned over to the prosecuting attorney for further action (*Id.*, ¶ 60). Ms. Arnett denies this with citation to record evidence and states that Mr. Grimes did not question any ADC staff or Stacey Smith, that he never determined if McPherson or ADC concealed Mr. DeWitt's abuse, and that Mr. DeWitt's sentence of five years on 50 counts speaks to the evidence underlying the conviction (*Id.*). ADC Defendants state that on December 17, 2015, the Jackson County Prosecuting Attorney charged Mr. DeWitt with Sexual Assault in the Third Degree (*Id.*, ¶ 61). Ms. Arnett admits that Mr. DeWitt was charged with 50 counts (*Id.*). ADC Defendants state that on July 5, 2016, Mr. DeWitt pleaded guilty to Sexual Assault in the Third Degree and was sentenced to a term of 60 months in the ADC and 60 months suspended imposition of sentence (*Id.*, ¶ 62). Ms. Arnett admits that Mr. DeWitt pleaded guilty to 50 counts (*Id.*).

ADC Defendants state that, prior to the allegations by Ms. Arnett and two other inmates in 2014, Mr. Faust was never aware of any allegations or accusations made against Mr. DeWitt (*Id.*, ¶ 63). Ms. Arnett denies this and states with citation to record evidence that, based on ADC documents, Mr. DeWitt was accused of retaliation on several occasions prior to 2014 (*Id.*).[3]

---

[3] Ms. Arnett's response to the ADC Defendants' statement of undisputed material facts, in support of her denial to this allegation, includes a table of all prior allegations against Mr. Dewitt accusing him of retaliation on several occasions prior to 2014 (Dkt. No. 49, ¶ 63).

ADC Defendants state that, since at least 2005, the ADC has had a policy on PREA (*Id.*, ¶ 64). Ms. Arnett admits this but denies with citation to record evidence that it was fully implemented (*Id*). Ms. Arnett states that the ADC was not 100% PREA compliant between 2012–15 because the ADC refused to meet certain required standards; that the ADC refused to allow official PREA auditors to come to the prison; that Ms. Kelley recommended to then–Governors Mike Beebe and Asa Hutchinson that ADC not comply with federal PREA regulations because she did not want to pay for a PREA–certified auditor, especially since compliance is based on a pass or fail standard; and that Ms. Kelley put this in official letters to the Governors (*Id.*).

ADC Defendants state that in 2008, Mr. Hobbs was tasked with the coordination and implementation of PREA within the ADC (*Id.*, ¶ 65). Ms. Arnett admits this and adds with citation to record evidence that, per official ADC documents, deficits identified by the DOJ in 2003—including failure to comply with PREA—were still not remedied in 2012 during Mr. Hobbs' tenure as ADC director (*Id.*). Mr. Hobbs attended several national PREA conferences and the National Institute of Corrections for PREA training (*Id.*, ¶ 66).

ADC Defendants state that the ADC continually revamped PREA protocols to keep with changing PREA laws and standards (*Id.*, ¶ 67). Ms. Arnett denies this and states with citation to record evidence that, per official ADC documents, deficits identified by the DOJ in 2003—including failure to comply with PREA—were still not remedied in 2012 during Mr. Hobbs' tenure as ADC director (*Id.*, ¶¶ 65, 67).

ADC Defendants state that ADC Administrative Directive ("AD") 11–63 Prison Rape Elimination Act (PREA) took effect November 18, 2011, and that AD 11–63 required the ADC to determine adequate staffing levels and video monitoring to protect inmates from sexual abuse and required an annual security audit to determine if adjustments needed to be made (*Id.*, ¶¶ 68, 69).

ADC Defendants state that, since at least 2005, the ADC has had a policy of "zero tolerance" for rape or sexual abuse of inmates by staff or other inmates (*Id.*, ¶ 71).

Ms. Arnett admits these statements about AD 11–63 and the "zero tolerance" policy but denies with citation to record evidence that these policies were fully implemented (*Id.*, ¶¶ 64, 68, 69, 71). Ms. Arnett states that the ADC was not 100% PREA compliant between 2012–15 because the ADC refused to meet certain required standards; that the ADC refused to allow official PREA auditors to come to the prison; that Ms. Kelley recommended to then–Governors Mike Beebe and Asa Hutchinson that ADC not comply with federal PREA regulations because she did not want to pay for a PREA–certified auditor, especially since compliance is based on a pass or fail standard; and that Ms. Kelley put this in official letters to the Governors (*Id.*, ¶¶ 64, 68, 69).

ADC Defendants state that security audits typically lasted 8–10 hours and were conducted by a team of six or seven people including an audit inspector who would document all findings to be shared with top administrative staff (*Id.*, ¶ 70). Ms. Arnett states that she can neither admit nor deny this but adds that, if true, then security should have detected Dewitt's regularly covered office windows (*Id.*).

The sexual activity between Mr. DeWitt and Ms. Arnett is sexual abuse as defined by AD 11–63 (*Id.*, ¶ 72). ADC Defendants state that AD 11–63 requires a PREA checklist to be completed when there are allegations of sexual abuse (*Id.*, ¶ 73). Ms. Arnett admits this but adds with citation to record evidence that PREA protocol was not completed in her case because she was never given a rape kit testing which is part of the PREA checklist (*Id.*). ADC Defendants state that the PREA checklist is completed even if the complaint is far–fetched (*Id.*, ¶ 74). Ms. Arnett states that she can neither admit nor deny this (*Id.*).

ADC Defendants state that AD 11–63 states that Internal Affairs will conduct interviews of witnesses only after consulting with ASP or prosecutors (*Id.*, ¶ 75). Ms. Arnett states with citation to record evidence that PREA investigations are separate and distinct from criminal investigations; that the state police conduct their own investigation; that the state police are not concerned about whether ADC policies were violated; that PREA policy covering sexual misconduct with inmates presumes a criminal investigation; that McPherson PREA policy required that all allegations of sexual abuse be investigated; that it was mandatory; that per the policy, it is mandatory that IA investigators collect and preserve evidence and witness statements; that PREA allegations have to be found substantiated or unsubstantiated; and that, for every PREA investigation, there should be a determination at some point (*Id.*).

ADC Defendants state that in December 2014, ADC staff members completed the PREA checklist regarding the sexual assault allegations by Ms. Arnett against Mr. DeWitt (*Id.*, ¶ 76). ADC Defendants state that unit staff stopped collecting statements as instructed by Mr. Naylor but followed through on everything else required by the PREA checklist (*Id.*, ¶ 77). Ms. Arnett denies these statements that the PREA checklist was completed, except for statements Mr. Naylor instructed unit staff to stop collecting, and states with citation to record evidence that PREA protocol was not completed in her case because she was never given a rape kit testing which is part of the PREA checklist (*Id.*, ¶¶ 73, 76, 77).

ADC Defendants state that ADC staff made the notifications required pursuant to AD 11–63 (*Id.*, ¶ 78). Ms. Arnett denies this with citation to record evidence and states that there were multiple instances of delay in the reporting process regarding Mr. Dewitt's sexual abuse allegations; that Jennifer Smith delayed reporting; that Mr. Yancey delayed reporting; that Mr. Mayfield delayed reporting; and that Mr. Naylor delayed notifying state police (*Id.*).   ADC

Defendants state that ADC staff stopped all investigative steps at the instruction of Mr. Naylor (*Id.*, ¶ 79).  Ms. Arnett states that she can neither admit nor deny this but admits that her statement was terminated and never resumed (*Id.*).

ADC Defendants contend that, when ADC refers a matter to ASP including PREA investigations, the ADC investigation goes on pause to avoid causing problems with the state police investigation (*Id.*, ¶ 80).  Ms. Arnett does not admit or deny this allegation.

ADC Defendants state that, generally, ASP did not want ADC conducting interviews when they were investigating (*Id.*, ¶ 81).  Ms. Arnett respond that she can neither admit nor deny this statement and refer to her response to a prior statement, challenging the ADC Defendants' representations on how an ASP investigation and PREA investigation should proceed (*Id.*, ¶¶ 75, 81).

ADC Defendants also state that, in some instances, including when an ASP investigation leads to a prosecution, there is no need for the ADC to resume their investigation (*Id.*, ¶ 82).  Ms. Arnett denies this allegation and adds with citation to record evidence that PREA investigations are separate and distinct from criminal investigations; that state police conducts their own investigation; that state police are not concerned about whether ADC policies were violated; that PREA policy covering sexual misconduct with inmates presumes a criminal investigation; that McPherson PREA policy required that all allegations of sexual abuse be investigated; that it was mandatory; that per policy, it is mandatory that IA investigators collect and preserve evidence and witness statements; that PREA allegations have to be found substantiated or unsubstantiated, and for every PREA investigation, there should be a determination at some point (*Id.*, ¶¶ 75, 81, 82).

ADC Defendants state that, since at least 2000, the ADC has had a policy on Sexual Misconduct with Inmates (*Id.*, ¶ 83).  ADC Defendants state that ADC Administrative Directive

13–110 Sexual Misconduct with Inmates took effect November 22, 2013 (*Id.*, ¶ 84).   ADC Defendants state that AD 13–110 prohibits employees from engaging in intimate relationships with inmates (*Id.*, ¶ 85).   Ms. Arnett admits these statements regarding the ADC policy on Sexual Misconduct with Inmates and AD 13–110, but she denies that the policy was followed at McPherson (*Id.*, ¶¶ 83–85). Ms. Arnett states in response to these allegations by ADC Defendants with citation to record evidence that, despite the policy, Mr. DeWitt's sexual relationship with Stacey Smith was not investigated; that although the sexual relationship between the two was a terminable offense, Mr. Dewitt was allowed to resign rather than be terminated; and that by letting Mr. Dewitt resign, ADC Defendants avoided having to conduct an investigation into the matter (*Id.*)

ADC Defendants state that AD 13–110 prohibits retaliation against individuals because of their involvement in the reporting or investigation of a sexual misconduct complaint (*Id.*, ¶ 86). Ms. Arnett admits this with respect to AD 13–110 but adds with citation to record evidence that she has produced evidence of retaliation in an official ADC memo wherein Chaplain Yancey threatened her when she complained about Mr. Dewitt's family, writing "…if you continue to pursue to influence the leaders in the barracks to allow you in a teacher/leadership role, then I will have to re–evaluate your future in the PAL program." (*Id.*).   ADC Defendants state that AD 13–110 requires Prevention of Sexual Misconduct training for all current and newly hired personnel (*Id.*, ¶ 87).   ADC Defendants state that AD 13–110 requires employees to strictly adhere to the policy by ensuring their conduct does not constitute or promote sexual misconduct (*Id.*, ¶ 88).   Ms. Arnett admits these two statements regarding what AD 13–110 purports to require but denies that the policy is consistently adhered to (*Id.,* ¶¶ 87–88).

ADC Defendants state that ADC policies were designed to encourage reporting of sexual misconduct (*Id.*, ¶ 89).  ADC Defendants state that the ADC maintained a PREA hotline that inmates or their families could call to report sexual misconduct (*Id.*, ¶ 91).  Ms. Arnett states that she can neither admit nor deny these statements but denies that the policy is consistently adhered to (*Id.*, ¶¶ 89, 91).  ADC Defendants state that ADC staff members are required by policy to report sexual assault against inmates (*Id.*, ¶ 90).  Ms. Arnett admits this but denies that the policy is consistently adhered to (*Id.*).

Defendant state that security and non–security staff members, including Mr. DeWitt, are required to undergo annual training on the Sexual Misconduct and PREA Policies (*Id.*, ¶ 92).  ADC Defendants state that the Sexual Misconduct and PREA policies are reviewed regularly and any necessary updates are made (*Id.*, ¶ 93).  ADC Defendants state that AD 13–110 states that the ADC will fully investigate and discipline persons who violate the policy (*Id.*, ¶ 94).  Ms. Arnett admits these three statements but denies that the policy is consistently adhered to (*Id.*, ¶¶ 92–94).

ADC Defendants state that AD 13–110 requires Internal Affairs to notify ASP if there is sufficient evidence that a crime has occurred (*Id.*, ¶ 95).  Ms. Arnett admits this but denies that policy is consistently adhered to (*Id.*, ¶¶ 92, 95).  Ms. Arnett further states with citation to record evidence that the evidence of record shows an untimely referral to ASP on January 8, 2015, approximately 20 days after the allegations became known (*Id.*, ¶ 95).

ADC Defendants state that ADC standard practice is that, when an investigation was being forwarded to ASP, the ADC would not get statements from the victims or do their own investigation into the allegations (*Id.*, ¶ 96).  Ms. Arnett admits this and adds that this is a PREA violation (*Id.*).  ADC Defendants state that ADC Internal Affairs does not have the authority to conduct criminal investigation and that all allegations of criminal misconduct are turned over to

ASP pursuant to ADC policy (*Id.*, ¶ 97).  Ms. Arnett admits this but states with citation to record evidence that it is irrelevant because the goal of the state police is to determine if there was a criminal act; that the goal of the state police is not to determine if there was a PREA violation; and that PREA investigations are separate and distinct from criminal investigations (*Id.*).

ADC Defendants state that conducting a separate investigation while ASP was investigating could jeopardize the criminal investigation and the ability to get a criminal conviction if warranted (*Id.*, ¶ 98).  Ms. Arnett denies this (*Id*).

ADC Defendants state that, since at least 2006, the ADC has thoroughly investigated all allegations of sexual misconduct by staff on inmates (*Id.*, ¶ 99). Ms. Arnett denies this and states with citation to record evidence that ADC Defendants reported zero staff on inmate sexual misconduct in the current litigation (*Id.*).[4]

The Arkansas Department (now Division) of Corrections took over operations at the McPherson Unit on July 1, 2001 (*Id.*, ¶ 100).  Prior to July 2001, McPherson was operated by Wackenhut Corporation (*Id.*, ¶ 101).  ADC Defendants state that, in December of 2001, Mr. DeWitt signed a notice to all employees that "sexual misconduct with inmates will not be tolerated within the Arkansas Department of Correction" and that such conduct was a class C Felony (*Id.*, ¶ 102). Ms. Arnett admits this but states that it is irrelevant (*Id.*).

ADC Defendants state that, in 2002, the ADC again notified its employees that sexual misconduct with inmates violated ADC policy and Arkansas law and could result in a sentence to prison (*Id.*, ¶ 103). Ms. Arnett admits this but states that it is irrelevant (*Id.*, ¶¶ 102, 103).  ADC Defendants state that, in May 2002, McPherson instituted a One on One Procedure prohibiting

---

[4] Ms. Arnett's response to the ADC Defendants' statement of undisputed material facts, in support of her denial to this allegation, includes a table of prior incidents (Dkt. No. 49, ¶ 99).

male staff from being alone with female inmates except in situations including "counseling as part of a treatment team." (*Id.*, ¶ 104). Ms. Arnett states that she can neither admit nor deny this (*Id.*).

ADC Defendants state that the McPherson One on One Procedures stated that, when a male staff member had to be alone in a room with a female inmate, they "must have a window clear." (*Id.*, ¶ 105). ADC Defendants further state that male staff members were permitted to be alone with a female inmate in an office with a window if it was for official business including a job assignment (*Id.*, ¶ 106). In response to these two statements, Ms. Arnett states that she can neither admit nor deny these statements but adds with citation to record evidence that Mr. Budnik testified that he does not see a relation "between a covered window and something bad happening [inside], when you have the other window clear." (*Id.*, ¶¶ 105, 106). Ms. Arnett further states that, policies aside, if an institution is reasonably concerned with eliminating sexual abuse of inmates by staff, it forbids staff from covering any and all windows, particularly when alone with the inmate (*Id.*).

The DOJ conducted an investigation of McPherson and the Grimes Unit pursuant to CRIPA beginning in 2002 (*Id.*, ¶ 107). ADC Defendants state that the CRIPA investigation was based on complaints at the McPherson and Grimes Units during the time Wackenhut operated them (*Id.*, ¶ 108). Ms. Arnett denies this, states that it is irrelevant, and adds with citation to record evidence that Ms. Kelley, Mr. Norris, and other ADC Defendants had actual and constructive knowledge of DOJ's 2003 findings (*Id.*). ADC Defendants state that, in November 2003, the DOJ issued findings from their investigations and recommended remedial measures (*Id.*, ¶ 109). Ms. Arnett admits this and adds that Ms. Kelley, Mr. Norris, and other ADC Defendants had actual and constructive knowledge of DOJ's 2003 findings (*Id.*). ADC Defendants state that ADC staff and administrators fully cooperated with the DOJ investigations and responded promptly to document requests (*Id.*, ¶ 110). Ms. Arnett states that she can neither admit nor deny this (*Id.*).

The DOJ found that inmates at McPherson received inadequate medical care and inadequate protection from physical harm and sexual misconduct (*Id.*, ¶ 111). ADC Defendants state that the DOJ's findings stated that there were numerous sexual misconduct incidents at McPherson "under former management" and that "the number of allegations and incidents appears to have decreased since ADC assumed operational control in July 2001 and instituted policies and training to address staff/inmate sexual misconduct" (*Id.*, ¶ 112). Ms. Arnett admits this, states that it is irrelevant, and adds that Ms. Kelley, Mr. Norris, and other ADC Defendants had actual and constructive knowledge of DOJ's 2003 findings (*Id.*).

The DOJ made six recommendations pertaining sexual misconduct, supervision, and privacy (*Id.*, ¶ 113). ADC Defendants state that in August of 2004, the DOJ, the State of Arkansas, and the ADC entered into a Memorandum of Agreement ("MOA") that "resolved all of the issues identified" in the DOJ's findings and recommendations (*Id.*, ¶ 114). Ms. Arnett admits this and adds that add that Ms. Kelley, Mr. Norris, and other ADC Defendants had actual and constructive knowledge of DOJ's 2003 findings (*Id.*). ADC Defendants state that the ADC always maintained that there were no unconstitutional conditions at McPherson (*Id.*, ¶ 115). Ms. Arnett states that she can neither admit nor deny this and that it is irrelevant (*Id.*).

ADC Defendants state that, after signing the MOA, the ADC implemented the recommendations in the MOA that were not already in place (*Id.*, ¶ 116). ADC Defendants state that the ADC implemented whatever they agreed to immediately rather than waiting to put the measures into a long–range goal unless legislative funding was needed (*Id.*, ¶ 117). ADC Defendants state that there was only one recommendation made by the DOJ that the ADC declined to follow regarding a medical test and that the DOJ ultimately agreed it was not necessary (*Id.*, ¶ 118). Ms. Arnett denies these three statements by ADC Defendants (*Id.*, ¶¶ 116–118). Ms. Arnett

states with citation to record evidence that the ADC refused to implement the aspects of the MOA concerning PREA; that the ADC was not 100% PREA compliant between 2012–15 because the ADC refused to meet certain required standards; that the ADC refused to allow official PREA auditors to come to the prison; that Ms. Kelley recommended to then–Governors Mike Beebe and Asa Hutchinson that ADC not comply with federal PREA regulations because Ms. Kelley did not want to pay for a PREA–certified auditor, especially since compliance is based on a pass or fail standard; and that Ms. Kelley put this in official letters to the Governors (*Id.*).

ADC Defendants state that after entering the MOA, the ADC did additional training that included sending internal affairs investigators to some specialized training for investigating sexual assault (*Id.*, ¶ 119).  Ms. Arnett denies this and states that there is no objective or documentary evidence of this (*Id.*).

ADC Defendants state that, since 2003, the ADC has taken measures to improve visibility including adding cameras and PREA windows (*Id.*, ¶ 120).  ADC Defendants state that, when PREA was initiated, ADC officials walked the units checking for blind spots and areas where cameras should be placed (*Id.*, ¶ 121).  Ms. Arnett states that she can neither admit nor deny these two statements but adds that Mr. Budnik testified that he does not see a relation "between a covered window and something bad happening [inside], when you have the other window clear." (*Id.*, ¶¶ 120, 121).  Ms. Arnett further states that policies aside, if an institution is reasonably concerned with eliminating sexual abuse of inmates by staff, it forbids staff from covering any and all windows, particularly when alone with the inmate (*Id.*).

ADC Defendants state that, if Mr. Hobbs saw any blind spots at the units, he would have someone correct the issue and follow up on his next visit (*Id.*, ¶ 122).  Ms. Arnett denies this and states with citation to record evidence that Mr. Hobbs was not even aware that ADC and DOJ

20

signed a MOA regarding the 2003 recommendations which include mandates for unobstructed windows (*Id.*).

ADC Defendants state that the ADC Deputy Directors met with the ADC Director every week to make sure they all knew what was going on within the department and were aware of anything that needed to be addressed (*Id.*, ¶ 123).  ADC Defendants state that the ADC held monthly wardens meetings where they went over all new policies and that the wardens were responsible for making sure all staff knew about them (*Id.*, ¶ 124).  ADC Defendants state that the ADC conducted regular security and PREA audits of the units that would determine where more windows and cameras were needed (*Id.*, ¶ 125).  Ms. Arnett states that she can neither admit nor deny these three statements but that they are irrelevant (*Id.*, ¶¶ 123–125).

In 2015, the DOJ initiated a CRIPA investigation at McPherson (*Id.*, ¶ 126).  ADC Defendants state that the DOJ did not issue recommendations to the ADC as a result of the 2015 CRIPA investigation (*Id.*, ¶ 127).  Ms. Arnett denies this and states that an undated letter from DOJ to Arkansas Assistant Attorney General Christine Cryer, thanking her for ADC's acceptance of 2015 recommendations, has been disclosed in discovery (*Id.*).

Mr. DeWitt oversaw a religious based program at McPherson called Principles and Applications for Life ("PAL") from approximately 1998 to September 10, 2014 (*Id.*, ¶ 128).  ADC Defendants state that Mr. DeWitt did not have any involvement with PAL after September 10, 2014 (*Id.*, ¶ 129).  Ms. Arnett denies this and states with citation to record evidence that, after Mr. Dewitt resigned during a sex scandal, he guided the PAL program through his family:  his son, daughter–in–law, and daughter (*Id.*).  ADC Defendants state that the purpose of the PAL program is to "create better morale among the inmates, reduce disciplinary actions, and prepare the inmate to be a productive citizen." (*Id.*, ¶ 130).  Ms. Arnett admits that this is how the policy reads (*Id.*).

Ms. Arnett began participating in the PAL program in January 2000 (*Id.*, ¶ 131). Ms. Arnett began working in the office for PAL in about 2001 (*Id.*, ¶ 132). Ms. Arnett was a clerk in the PAL program the first time from about 2001 until 2003 (*Id.*, ¶ 133). Ms. Arnett went back into the PAL program in 2004 for six months (*Id.*, ¶ 134). Ms. Arnett entered the PAL program again in 2005 as a team leader (*Id.*, ¶ 135). Ms. Arnett also served as a PAL clerk from the latter part of 2005 or early 2006 through 2014 (*Id.*, ¶ 136).

ADC Defendants state that PAL clerks were "always around" Mr. DeWitt's office where they worked (*Id.*, ¶ 137). Ms. Arnett states that she can neither admit nor deny this (*Id.*). It was not unusual for PAL clerks to come and go from DeWitt's office several times a day (*Id.*, ¶ 138). ADC Defendants state that Ms. Arnett never complained to anyone about the way Mr. DeWitt ran the PAL program (*Id.*, ¶ 139). Ms. Arnett admits this but only prior to December 2014 (*Id.*).

ADC Defendants state that ADC policy did not prohibit Mr. DeWitt from being alone in his office with female inmates (*Id.*, ¶ 140). Ms. Arnett states that she can neither admit nor deny this but with citation to record evidence adds that Mr. Budnik testified that he does not see a relation "between a covered window and something bad happening [inside], when you have the other window clear." (*Id.*). Ms. Arnett adds that policies aside, if an institution is reasonably concerned with eliminating sexual abuse of inmates by staff, it forbids staff from covering any and all windows, particularly when alone with the inmate (*Id.*).

ADC Defendants state that, as chaplain, Mr. DeWitt discussed confidential information with inmates (*Id.*, ¶ 141). Ms. Arnett states that she can neither admit nor deny this (*Id.*).

ADC Defendants state that Mr. DeWitt's office had two windows including a window in the door known as a "PREA window." (*Id.*, ¶ 142). ADC Defendants state that ADC policy required that the PREA window remain unobstructed (*Id.*, ¶ 143). Ms. Arnett admits that Mr.

22

DeWitt had two windows, but Ms. Arnett denies that any policy forbidding windows be covered applies to certain windows but not others (*Id.*, ¶¶ 142, 143).  Further, Ms. Arnett state that there is no objective or documentary evidence of this (*Id.*).

ADC Defendants state that Mr. Budnik never observed Mr. DeWitt's PREA window to be obscured (*Id.*, ¶ 144).  Ms. Arnett states that she can neither admit nor deny this but adds with citation to record evidence that it is irrelevant because, if Mr. Budnik did, he would not report it or do anything about it (*Id.*).  Ms. Arnett further states that policies aside, if an institution is reasonably concerned with eliminating sexual abuse of inmates by staff, it forbids staff from covering any and all windows, particularly when alone with the inmate (*Id.*).

ADC Defendants state that the ADC did not allow staff to cover completely the windows so you could not see in an office (*Id.*, ¶ 145).  Ms. Arnett denies this with citation to record evidence and states that policies aside, if an institution is reasonably concerned with eliminating sexual abuse of inmates by staff, it forbids staff from covering any and all windows, particularly when alone with the inmate (*Id.*).

ADC Defendants state that Mr. Faust never saw Mr. DeWitt's office window obstructed by a trunk lid on the occasions she passed his office between 2010 and 2014 (*Id.*, ¶ 146).  Ms. Arnett states that she can neither admit nor deny this and adds that whether any individual had actual or constructive awareness of the substantial risk posed by Mr. Dewitt is a fact question (*Id.*).

ADC Defendants state that, in February or March of 2006, Ms. Kelley talked with Mr. DeWitt and instructed him to stop teaching the inmates to submit to their husbands and that she would fire him if she learned he was still teaching them that (*Id.*, ¶ 147).  ADC Defendants state that Mr. DeWitt acknowledged this meeting occurred and that he understood the instructions given to him by Ms. Kelley (*Id.*, ¶ 148).  ADC Defendants state that Ms. Kelley made sure Maggie Capel,

Warden of McPherson, knew that Ms. Kelley expected Ms. Capel to be monitoring what was happening in the PAL barracks and that Mr. DeWitt did not continue to make statements about inmates submitting to their husbands (*Id.*, ¶ 149).  Ms. Arnett states that she can neither admit nor deny these three statements but adds that, after the 2006 meeting, Ms. Kelley did not even believe Mr. DeWitt was sincere or truthful regarding the allegations (*Id.*, ¶¶ 147–149). Ms. Arnett states that she infers from the language in Chaplain Eddie Sensat's memo—stating that Mr. DeWitt did not actually make the detailed statements listed in the memo—that "Dewitt denied [the allegations and Sensat] was trying to be nice and say, 'I'm not calling you a liar, but don't do it again.'" (*Id.*). Ms. Arnett adds that, despite Mr. DeWitt committing a terminable offense, there was no IA investigation of his inappropriate religious teachings (*Id.*).  Ms. Arnett adds that Ms. Kelley testified that she could have directed Mr. Sensat to fire Mr. DeWitt but that she did not (*Id.*).  Ms. Arnett adds that, additionally, there is no objective or documentary evidence that Ms. Kelley followed up on this (*Id.*, ¶ 149).

ADC Defendants state that in 2006, Chaplain Eddie Sensat, Administrator of Religious Services, investigated complaints concerning Mr. DeWitt's teachings (*Id.*, ¶ 150). Ms. Arnett denies this and states that no investigation was opened; a meeting was held (*Id.*).  ADC Defendants state that, in 2006, Mr. Sensat advised Mr. DeWitt of six things he was not to teach or tell the inmates and that he was not to retaliate against inmates for complaining about his teachings (*Id.*, ¶ 151).  Ms. Arnett states that she can neither admit nor deny this statement but adds that Mr. Sensat's memo indicates his disbelief that Mr. DeWitt said the things he was alleged to have said (*Id.*).

ADC Defendants state that, in January of 2006, Mr. DeWitt confronted inmate Jen Mathis about allegations she made that his teachings contained improper sexual content (*Id.*, ¶ 152).  Ms.

Arnett admits this and states with citation to record evidence that it was a bizarre episode which demonstrated a gross abuse of authority and mental abuse committed by Mr. DeWitt (*Id.*).  ADC Defendants state that Mr. DeWitt's conversation with Ms. Mathis about the allegations was never reported to any other ADC staff member (*Id.*, ¶ 153).  Ms. Arnett denies this and states with citation to record evidence that it was an official document on ADC letterhead (*Id.*).

ADC Defendants state that Ms. Arnett has no personal knowledge of anyone reporting allegations of sexual misconduct to ADC staff prior to August 2014 (*Id.*, ¶ 154).  ADC Defendants state that Ms. Arnett has no personal knowledge of a sexual relationship between Stacey Smith and Mr. DeWitt prior to 2014 (*Id.*, ¶ 155).  ADC Defendants state that Ms. Arnett has no personal knowledge of any allegations or complaints of sexual misconduct involving Mr. DeWitt other than her own (*Id.*, ¶ 156).  Ms. Arnett objects to these three statements as vague as to "personal," denies the statements, and states with citation to record evidence that she has firsthand knowledge of several accusations against Mr. DeWitt resulting from her working in the PAL office (*Id.*, ¶¶ 154–156).

ADC Defendants state that Larry Norris, Ray Hobbs, Wendy Kelley, Christopher Budnik, and Linda Dykes did not engage in retaliation against Ms. Arnett (*Id.*, ¶ 157).  Ms. Arnett denies this and states that whether any individual had a role in the retaliation she suffered is a fact question (*Id.*).

ADC Defendants state that no inmate ever complained to Mr. Hobbs about Mr. DeWitt (*Id.*, ¶ 158).  ADC Defendants state that Mr. Hobbs never heard any rumors or "scuttlebutt" regarding the substance of DeWitt's teachings (*Id.*, ¶ 159).  ADC Defendants state that Mr. Hobbs learned about the allegations of sexual misconduct by Mr. DeWitt while watching the news after he retired from the ADC (*Id.*, ¶ 160).  Ms. Arnett denies these statements and states that whether

any individual had actual or constructive awareness of the substantial risk posed by Mr. Dewitt is a fact question (*Id.*, ¶¶ 158–160).

In 2009, Ms. Faust had some responsibility as Deputy Warden over the chaplaincy (*Id.*, ¶ 161). ADC Defendants state that during the time she oversaw the chaplaincy, Ms. Faust did not identify any problems with Mr. DeWitt's practices or see anything that raised red flags with how he ran the PAL program. (*Id.*, ¶ 162). Ms. Arnett denies this and states that whether any individual had actual or constructive awareness of the substantial risk posed by Mr. Dewitt is a fact question (*Id.*). ADC Defendants state that, as Deputy Warden from 2010 to 2015, Ms. Faust was not responsible for monitoring the chaplain at McPherson (*Id.*, ¶ 163). Ms. Arnett denies this statement, but Ms. Arnett states that it is irrelevant and adds with citation to record evidence that, per ADC policy, all staff members were subject to the duty to report any perceived instance of sexual misconduct committed by prison staff, including any improper actions by Mr. Dewitt (*Id.*).

ADC Defendants state that from 2010 through 2015, Ms. Faust's office as Deputy Warden was not near Mr. DeWitt's office (*Id.*, ¶ 164). Ms. Arnett denies this and states that their offices were located in the same hallway (*Id.*). All parties admit that Ms. Faust passed DeWitt's office at least once a week from 2010–2015 (*Id.*, ¶ 165).

ADC Defendants state that Ms. Faust never saw any inmate's demeanor leaving Mr. DeWitt's office that would raise any red flags for her (*Id.*, ¶ 166). ADC Defendants state that Ms. Faust never saw any misconduct between Mr. DeWitt and the inmates (*Id.*, ¶ 167). ADC Defendants state that, prior to 2014, Ms. Faust never heard any allegations of Mr. DeWitt committing misconduct (*Id.*, ¶ 168). Ms. Arnett denies these three statements, but Ms. Arnett adds that whether any individual had actual or constructive awareness of the substantial risk posed by Mr. DeWitt is a fact question (*Id.*, ¶¶ 166–168).

ADC Defendants state that, as a Captain at McPherson from 2010 to 2014, Ms. Dykes made rounds covering the entire facility at McPherson, including the hallway in front of Mr. DeWitt's office, daily (*Id.*, ¶ 169).  Ms. Arnett denies this and states that there is no objective or documentary evidence of this (*Id.*).  ADC Defendants state that, during rounds, Ms. Dykes would check to make sure the PREA windows were not obscured (*Id.*, ¶ 170).  Ms. Arnett denies this and states that there is no objective or documentary evidence of this (*Id.*).  ADC Defendants state that Ms. Dykes's office at McPherson was separated from Mr. DeWitt's office by several doors and crash gates (*Id.*, ¶ 171).

ADC Defendants state that, prior to 2014, Ms. Dykes was not aware of any allegations of any type of misconduct or any complaints against Mr. DeWitt (*Id.*, ¶ 172).  Ms. Arnett denies this but states that whether any individual had actual or constructive awareness of the substantial risk posed by Mr. DeWitt is a fact question (*Id.*).

Mr. Budnik's office at McPherson was on the same hallway as Mr. DeWitt's office (*Id.*, ¶ 173).  ADC Defendants state that Mr. Budnik did not supervise the chaplain at McPherson (*Id.*, ¶ 174).  Ms. Arnett denies this but states that it is irrelevant and adds with citation to record evidence that, per ADC policy, all staff members were subject to the duty to report any perceived instance of sexual misconduct committed by prison staff, including any improper actions by Mr. DeWitt (*Id.*).  ADC Defendants state that, as Deputy Warden, Mr. Budnik regularly conducted rounds looking for issues in the facility (*Id.*, ¶ 175).  Ms. Arnett denies but states that whether any individual had actual or constructive awareness of the substantial risk posed by Mr. DeWitt is a fact question (*Id.*).  Ms. Arnett adds with citation to record evidence that, moreover, pertaining to Mr. Budnik, this is irrelevant because, if he did see issues pertaining to visibility, he would not report it or do anything about it (*Id.*).  Ms. Arnett states that policies aside, if an institution is

27

reasonably concerned with eliminating sexual abuse of inmates by staff, it forbids staff from covering any and all windows, particularly when alone with the inmate (*Id.*).

ADC Defendants state that ADC staff conducted a variety of facility inspections on a daily, weekly, monthly, and annual basis (*Id.*, ¶ 176).  Ms. Arnett denies this and states that there is no objective or documentary evidence of this (*Id.*).

ADC Defendants state that, prior to 2014, Mr. Budnik never heard any allegations or controversy about Mr. DeWitt or the PAL program (*Id.*, ¶ 177).  ADC Defendants state that Mr. Budnik never received any complaints about Mr. DeWitt from any inmate (*Id.*, ¶ 178).  ADC Defendants state that Mr. Budnik never saw inmates leave Mr. DeWitt's office visibly upset (*Id.*, ¶ 179).  Ms. Arnett denies these three statements and states that whether any individual had actual or constructive awareness of the substantial risk posed by Mr. DeWitt is a fact question (*Id.*).

ADC Defendants state that Wesley Wilmoth was a corporal at McPherson from approximately 2013 to 2015 (*Id.*, ¶ 180).  ADC Defendants state that, on the occasions when Mr. Wilmoth was outside Mr. DeWitt's office, he never witnessed Mr. DeWitt behaving inappropriately with an inmate (*Id.*, ¶ 181).  ADC Defendants state that, if Mr. Wilmoth had witnessed any inappropriate behavior by Mr. DeWitt, he would have immediately reported it to his superiors (*Id.*, ¶ 182).  ADC Defendants state that Mr. Wilmoth did not learn about the allegations regarding Mr. DeWitt's sexual misconduct with inmates until after Mr. DeWitt's employment with ADC ended (*Id.*, ¶ 183).  ADC Defendants state that Mr. Wilmoth occasionally interacted with Mr. DeWitt and never witnessed anything that would lead him to believe Mr. DeWitt was engaging in sexual misconduct with inmates (*Id.*, ¶ 184).  ADC Defendants state that no inmate ever reported to Mr. Wilmoth that Mr. DeWitt was engaging in sexual misconduct with them (*Id.*, ¶ 185).  Ms. Arnett states that she can neither admit nor deny these statements about Mr.

Wilmoth but adds that this individual was not named in ADC Defendants' April 2023 disclosures nor identified in discovery (*Id.*, ¶¶ 180–185). Ms. Arnett states that, moreover, whether any individual had actual or constructive awareness of the substantial risk posed by Mr. DeWitt is a fact question (*Id.*). Ms. Arnett states that this Court has every right to view ADC employee affidavits with skepticism (*Id.*). Ms. Arnett states that, in her initial litigation, ADC Defendants produced two affidavits in support of a dispositive motion which gave the Court pause and raised concerns because they contained demonstrably false statements and/or material omissions (*Id.*)

ADC Defendants state that Krissie Weeks was a correctional officer then corporal at McPherson from approximately 2010 to 2015 (*Id.*, ¶ 186). ADC Defendants state that, on the occasions when Ms. Weeks was outside Mr. DeWitt's office, she never witnessed Mr. DeWitt behaving inappropriately with an inmate (*Id.*, ¶ 187). ADC Defendants state that, if Ms. Weeks had witnessed any inappropriate behavior by Mr. DeWitt, she would have immediately reported it to her superiors (*Id.*, ¶ 188). ADC Defendants state that Ms. Weeks did not learn about the allegations regarding Mr. DeWitt's sexual misconduct with inmates until after Mr. DeWitt's employment with ADC ended (*Id.*, ¶ 189). ADC Defendants state that Ms. Weeks occasionally interacted with Mr. DeWitt and never witnessed anything that would lead her to believe Mr. DeWitt was engaging in sexual misconduct with inmates (*Id.*, ¶ 190). ADC Defendants state that no inmate ever reported to Ms. Weeks that Mr. DeWitt was engaging in sexual misconduct with them (*Id.*, ¶ 191). Ms. Arnett states that she can neither admit nor deny these statements regarding Ms. Weeks but adds that this individual was not named in ADC Defendants' April 2023 disclosures nor identified in discovery (*Id.*, ¶¶ 180, 186–191). Ms. Arnett states that, moreover, whether any individual had actual or constructive awareness of the substantial risk posed by Mr. DeWitt is a fact question (*Id.*). Ms. Arnett states that this Court has every right to view ADC

employee affidavits with skepticism (*Id.*).  Ms. Arnett states that in her initial litigation, ADC Defendants produced two affidavits in support of a dispositive motion which gave the Court pause and raised concerns because they contained demonstrably false statements and/or material omissions (*Id.*)

ADC Defendants state that Donna Jarrett was a corporal at McPherson from 2010 to 2015 (*Id.*, ¶ 192).  ADC Defendants state that, on the occasions when Ms. Jarrett was outside Mr. DeWitt's office, she never witnessed Mr. DeWitt behaving inappropriately with an inmate (*Id.*, ¶ 193).  ADC Defendants state that, if Ms. Jarrett had witnessed any inappropriate behavior by Mr. DeWitt, she would have immediately reported it to her superiors (*Id.*, ¶ 194).  ADC Defendants state that Ms. Jarrett did not learn about the allegations regarding Mr. DeWitt's sexual misconduct with inmates until after Mr. DeWitt's employment with ADC ended (*Id.*, ¶ 195).  ADC Defendants state that Ms. Jarrett occasionally interacted with Mr. DeWitt and never witnessed anything that would lead her to believe Mr. DeWitt was engaging in sexual misconduct with inmates (*Id.*, ¶ 196).  ADC Defendants state that no inmate ever reported to Ms. Jarrett that Mr. DeWitt was engaging in sexual misconduct with them (*Id.*, ¶ 197).  Ms. Arnett states that she can neither admit nor deny these statements regarding Ms. Jarrett but adds that this individual was not named in ADC Defendants' April 2023 disclosures nor identified in discovery (*Id.*, ¶¶ 180, 192–197).  Ms. Arnett states that, moreover, whether any individual had actual or constructive awareness of the substantial risk posed by Mr. DeWitt is a fact question (*Id.*).  Ms. Arnett states that this Court has every right to view ADC employee affidavits with skepticism (*Id.*).  Ms. Arnett states that in her initial litigation, ADC Defendants produced two affidavits in support of a dispositive motion which gave the Court pause and raised concerns because they contained demonstrably false statements and/or material omissions (*Id.*)

ADC Defendants state that Clara Robinson was a Program Specialist at McPherson from 2010 to 2015 (*Id.*, ¶ 198).  ADC Defendants state that, on the occasions when Ms. Robinson was outside Mr. DeWitt's office, she never witnessed Mr. DeWitt behaving inappropriately with an inmate (*Id.*, ¶ 199).  ADC Defendants state that, if Ms. Robinson had witnessed any inappropriate behavior by Mr. DeWitt, she would have immediately reported it to her superiors (*Id.*, ¶ 200).  ADC Defendants state that Ms. Robinson did not learn about the allegations regarding Mr. DeWitt's sexual misconduct with inmates until after Mr. DeWitt's employment with ADC ended (*Id.*, ¶ 201).  ADC Defendants state that Ms. Robinson occasionally interacted with Mr. DeWitt and never witnessed anything that would lead her to believe Mr. DeWitt was engaging in sexual misconduct with inmates (*Id.*, ¶ 202).  ADC Defendants state that no inmate ever reported to Ms. Robinson that Mr. DeWitt was engaging in sexual misconduct with them (*Id.*, ¶ 203).  Ms. Arnett states that she can neither admit nor deny these statements regarding Ms. Robinson but adds that this individual was not named in ADC Defendants' April 2023 disclosures nor identified in discovery (*Id.*, ¶¶ 180, 198–203).  Ms. Arnett states that, moreover, whether any individual had actual or constructive awareness of the substantial risk posed by Mr. DeWitt is a fact question (*Id.*).  Ms. Arnett states that this Court has every right to view ADC employee affidavits with skepticism (*Id.*).  Ms. Arnett states that in her initial litigation, ADC Defendants produced two affidavits in support of a dispositive motion which gave the Court pause and raised concerns because they contained demonstrably false statements and/or material omissions (*Id.*)

ADC Defendants state that Michael Harmon was a Corporal then Sergeant at McPherson from 2010 to 2015 (*Id.*, ¶ 204).  ADC Defendants state that, on the occasions when Mr. Harmon was outside Mr. DeWitt's office, he never witnessed Mr. DeWitt behaving inappropriately with an inmate (*Id.*, ¶ 205).  ADC Defendants state that, if Mr. Harmon had witnessed any inappropriate

behavior by Mr. DeWitt, he would have immediately reported it to his superiors (*Id.*, ¶ 206).  ADC Defendants state that Mr. Harmon did not learn about the allegations regarding Mr. DeWitt's sexual misconduct with inmates until after Mr. DeWitt's employment with ADC ended (*Id.*, ¶ 207).  ADC Defendants state that Mr. Harmon occasionally interacted with Mr. DeWitt and never witnessed anything that would lead him to believe Mr. DeWitt was engaging in sexual misconduct with inmates (*Id.*, ¶ 208).  ADC Defendants state that no inmate ever reported to Mr. Harmon that Mr. DeWitt was engaging in sexual misconduct with them (*Id.*, ¶ 209).  Ms. Arnett states that she can neither admit nor deny these statements regarding Mr. Harmon but adds that this individual was not named in ADC Defendants' April 2023 disclosures nor identified in discovery (*Id.*, ¶¶ 180, 204–209).  Ms. Arnett states that, moreover, whether any individual had actual or constructive awareness of the substantial risk posed by Mr. DeWitt is a fact question (*Id.*).  Ms. Arnett states that this Court has every right to view ADC employee affidavits with skepticism (*Id.*).  Ms. Arnett states that in her initial litigation, ADC Defendants produced two affidavits in support of a dispositive motion which gave the Court pause and raised concerns because they contained demonstrably false statements and/or material omissions (*Id.*)

ADC Defendants state that Roger Ayers was a sergeant at McPherson from 2010 to 2015 (*Id.*, ¶ 210).  ADC Defendants state that, on the occasions when Mr. Ayers was outside Mr. DeWitt's office, he never witnessed Mr. DeWitt behaving inappropriately with an inmate (*Id.*, ¶ 211).  ADC Defendants state that, if Mr. Ayers had witnessed any inappropriate behavior by Mr. DeWitt, he would have immediately reported it to his superiors (*Id.*, ¶ 212).  ADC Defendants state that Mr. Ayers did not learn about the allegations regarding Mr. DeWitt's sexual misconduct with inmates until after Mr. DeWitt's employment with ADC ended (*Id.*, ¶ 213).  ADC Defendants state that Mr. Ayers occasionally interacted with Mr. DeWitt and never witnessed anything that would

lead him to believe Mr. DeWitt was engaging in sexual misconduct with inmates (*Id.*, ¶ 214). ADC Defendants state that no inmate ever reported to Mr. Ayers that Mr. DeWitt was engaging in sexual misconduct with them (*Id.*, ¶ 215). Ms. Arnett states that she can neither admit nor deny these statements regarding Mr. Ayers but adds that this individual was not named in ADC Defendants' April 2023 disclosures nor identified in discovery (*Id.*, ¶¶ 180, 210–215). Ms. Arnett states that, moreover, whether any individual had actual or constructive awareness of the substantial risk posed by Mr. DeWitt is a fact question (*Id.*). Ms. Arnett states that this Court has every right to view ADC employee affidavits with skepticism (*Id.*). Ms. Arnett states that, in her initial litigation, ADC Defendants produced two affidavits in support of a dispositive motion which gave the Court pause and raised concerns because they contained demonstrably false statements and/or material omissions (*Id.*)

ADC Defendants state that Gwendolyn Cox was a Sergeant at McPherson from 2010 to 2015 (*Id.*, ¶ 216). ADC Defendants state that, on the occasions when Ms. Cox was outside Mr. DeWitt's office, she never witnessed Mr. DeWitt behaving inappropriately with an inmate (*Id.*, ¶ 217). ADC Defendants state that, if Ms. Cox had witnessed any inappropriate behavior by Mr. DeWitt, she would have immediately reported it to her superiors (*Id.*, ¶ 218). ADC Defendants state that Ms. Cox did not learn about the allegations regarding Mr. DeWitt's sexual misconduct with inmates until after Mr. DeWitt's employment with ADC ended (*Id.*, ¶ 219). ADC Defendants state that Ms. Cox occasionally interacted with Mr. DeWitt and never witnessed anything that would lead her to believe Mr. DeWitt was engaging in sexual misconduct with inmates (*Id.*, ¶ 220). ADC Defendants state that no inmate ever reported to Ms. Cox that Mr. DeWitt was engaging in sexual misconduct with them (*Id.*, ¶ 221). Ms. Arnett states that she can neither admit nor deny these statements regarding Ms. Cox but adds that this individual was not named in ADC

Defendants' April 2023 disclosures nor identified in discovery (*Id.*, ¶¶ 180, 216–221).  Ms. Arnett states that, moreover, whether any individual had actual or constructive awareness of the substantial risk posed by Mr. DeWitt is a fact question (*Id.*).  Ms. Arnett states that this Court has every right to view ADC employee affidavits with skepticism (*Id.*).  Ms. Arnett states that, in her initial litigation, ADC Defendants produced two affidavits in support of a dispositive motion which gave the Court pause and raised concerns because they contained demonstrably false statements and/or material omissions (*Id.*)

ADC Defendants state that Jeannie Long was a Classification Review Officer at McPherson from 2010 to 2015 (*Id.*, ¶ 222).  ADC Defendants state that, on the occasions when Ms. Long was outside Mr. DeWitt's office, she never witnessed Mr. DeWitt behaving inappropriately with an inmate (*Id.*, ¶ 223).  ADC Defendants state that, if Ms. Long had witnessed any inappropriate behavior by Mr. DeWitt, she would have immediately reported it to her superiors (*Id.*, ¶ 224).  ADC Defendants state that Ms. Long did not learn about the allegations regarding Mr. DeWitt's sexual misconduct with inmates until after Mr. DeWitt's employment with ADC ended (*Id.*, ¶ 225).  ADC Defendants state that Ms. Long occasionally interacted with Mr. DeWitt and never witnessed anything that would lead her to believe Mr. DeWitt was engaging in sexual misconduct with inmates (*Id.*, ¶ 226).  ADC Defendants state that no inmate ever reported to Ms. Long that Mr. DeWitt was engaging in sexual misconduct with them (*Id.*, ¶ 227).  Ms. Arnett states that she can neither admit nor deny these statements regarding Ms. Long but adds that this individual was not named in ADC Defendants' April 2023 disclosures nor identified in discovery (*Id.*, ¶¶ 180, 222–227).  Ms. Arnett states that, moreover, whether any individual had actual or constructive awareness of the substantial risk posed by Mr. DeWitt is a fact question (*Id.*).  Ms. Arnett states that this Court has every right to view ADC employee affidavits with skepticism (*Id.*).

Ms. Arnett states that, in her initial litigation, ADC Defendants produced two affidavits in support of a dispositive motion which gave the Court pause and raised concerns because they contained demonstrably false statements and/or material omissions (*Id.*)

ADC Defendants state that Sandra Carter was a Corporal at McPherson from 2008 to 2013 (*Id.*, ¶ 228).   ADC Defendants state that Ms. Carter never witnessed Mr. DeWitt behaving inappropriately with an inmate (*Id.*, ¶ 229).   ADC Defendants state that, if Ms. Carter had witnessed any inappropriate behavior by Mr. DeWitt, she would have immediately reported it to her superiors (*Id.*, ¶ 230).   ADC Defendants state that Ms. Carter did not learn about the allegations regarding Mr. DeWitt's sexual misconduct with inmates until after Mr. DeWitt's employment with ADC ended (*Id.*, ¶ 231).   ADC Defendants state that Ms. Carter interacted with Mr. DeWitt and never witnessed anything that would lead her to believe Mr. DeWitt was engaging in sexual misconduct with inmates (*Id.*, ¶ 232).   ADC Defendants state that no inmate ever reported to Ms. Carter that Mr. DeWitt was engaging in sexual misconduct with them (*Id.*, ¶ 233).   Ms. Arnett states that she can neither admit nor deny these statements regarding Sandra Carter but adds that this individual was not named in ADC Defendants' April 2023 disclosures nor identified in discovery (*Id.*, ¶¶ 180, 228–233).   Ms. Arnett states that, moreover, whether any individual had actual or constructive awareness of the substantial risk posed by Mr. DeWitt is a fact question (*Id.*).   Ms. Arnett states that this Court has every right to view ADC employee affidavits with skepticism (*Id.*).   Ms. Arnett states that, in her initial litigation, ADC Defendants produced two affidavits in support of a dispositive motion which gave the Court pause and raised concerns because they contained demonstrably false statements and/or material omissions (*Id.*)

ADC Defendants state that Phillip Norton was a Corporal at McPherson from 2010 to 2015 (*Id.*, ¶ 234).   ADC Defendants state that, on the occasions when Mr. Norton was outside Mr.

DeWitt's office, he never witnessed Mr. DeWitt behaving inappropriately with an inmate (*Id.*, ¶ 235).  ADC Defendants state that, if Mr. Norton had witnessed any inappropriate behavior by Mr. DeWitt, he would have immediately reported it to his superiors (*Id.*, ¶ 236).  ADC Defendants state that Mr. Norton did not learn about the allegations regarding Mr. DeWitt's sexual misconduct with inmates until after Mr. DeWitt's employment with ADC ended (*Id.*, ¶ 237).  ADC Defendants state that Mr. Norton occasionally interacted with Mr. DeWitt and never witnessed anything that would lead him to believe Mr. DeWitt was engaging in sexual misconduct with inmates (*Id.*, ¶ 238).  ADC Defendants state that no inmate ever reported to Mr. Norton that Mr. DeWitt was engaging in sexual misconduct with them (*Id.*, ¶ 239).  Ms. Arnett states that she can neither admit nor deny these statements regarding Mr. Norton but adds that this individual was not named in ADC Defendants' April 2023 disclosures nor identified in discovery (*Id.*, ¶¶ 180, 234–239).  Ms. Arnett states that, moreover, whether any individual had actual or constructive awareness of the substantial risk posed by Mr. DeWitt is a fact question (*Id.*).  Ms. Arnett states that this Court has every right to view ADC employee affidavits with skepticism (*Id.*).  Ms. Arnett states that, in her initial litigation, ADC Defendants produced two affidavits in support of a dispositive motion which gave the Court pause and raised concerns because they contained demonstrably false statements and/or material omissions (*Id.*).

ADC Defendants state that Jackie Carter was a Corporal at McPherson from 2007 to 2013, and that for most of that time, he was the acting housing sergeant for the PAL barracks and was regularly in the area around Mr. DeWitt's office (*Id.*, ¶ 240).  ADC Defendants state that Mr. Carter never witnessed Mr. DeWitt behaving inappropriately with an inmate (*Id.*, ¶ 241).  ADC Defendants state that, if Mr. Carter had witnessed any inappropriate behavior by Mr. DeWitt, he would have immediately reported it to his superiors (*Id.*, ¶ 242).  ADC Defendants state that Mr.

Carter did not learn about the allegations regarding Mr. DeWitt's sexual misconduct with inmates until after Mr. DeWitt's employment with ADC ended (*Id.*, ¶ 243).  ADC Defendants state that Mr. Carter interacted with Mr. DeWitt when he worked for the ADC and never witnessed anything that would lead him to believe Mr. DeWitt was engaging in sexual misconduct with inmates (*Id.*, ¶ 244).  ADC Defendants state that no inmate ever reported to Mr. Carter that Mr. DeWitt was engaging in sexual misconduct with them (*Id.*, ¶ 245).  Ms. Arnett states that she can neither admit nor deny these statements regarding Jackie Carter but adds that this individual was not named in ADC Defendants' April 2023 disclosures nor identified in discovery (*Id.*, ¶¶ 180, 240–245).  Ms. Arnett states that, moreover, whether any individual had actual or constructive awareness of the substantial risk posed by Mr. DeWitt is a fact question (*Id.*).  Ms. Arnett states that this Court has every right to view ADC employee affidavits with skepticism (*Id.*).  Ms. Arnett states that, in her initial litigation, ADC Defendants produced two affidavits in support of a dispositive motion which gave the Court pause and raised concerns because they contained demonstrably false statements and/or material omissions (*Id.*).

ADC Defendants state that Sarah Martin was a sergeant at McPherson from 2010 to 2015 (*Id.*, ¶ 246).  ADC Defendants state that Ms. Martin never witnessed Mr. DeWitt behaving inappropriately with an inmate (*Id.*, ¶ 247).  ADC Defendants state that, if Ms. Martin had witnessed any inappropriate behavior by Mr. DeWitt, she would have immediately reported it to her superiors (*Id.*, ¶ 248).  ADC Defendants state that Ms. Martin did not learn about the allegations regarding Mr. DeWitt's sexual misconduct with inmates until after Mr. DeWitt's employment with ADC ended (*Id.*, ¶ 249).  ADC Defendants state that Ms. Martin interacted with Mr. DeWitt and never witnessed anything that would lead her to believe Mr. DeWitt was engaging in sexual misconduct with inmates (*Id.*, ¶ 250).  ADC Defendants state that no inmate ever reported to Ms.

Martin that Mr. DeWitt was engaging in sexual misconduct with them (*Id.*, ¶ 251).  Ms. Arnett states that she can neither admit nor deny these statements regarding Sarah Martin but adds that this individual was not named in ADC Defendants' April 2023 disclosures nor identified in discovery (*Id.*, ¶¶ 180, 246–251).  Ms. Arnett states that, moreover, whether any individual had actual or constructive awareness of the substantial risk posed by Mr. DeWitt is a fact question (*Id.*).  Ms. Arnett states that this Court has every right to view ADC employee affidavits with skepticism (*Id.*).  Ms. Arnett states that, in her initial litigation, ADC Defendants produced two affidavits in support of a dispositive motion which gave the Court pause and raised concerns because they contained demonstrably false statements and/or material omissions (*Id.*)

ADC Defendants state that Boyd Martin was the Fire and Safety Officer at McPherson from 2010 to 2015 and his office was located on the "back hall" near Mr. DeWitt's office (*Id.*, ¶ 252).  ADC Defendants state that Mr. Martin never witnessed Mr. DeWitt behaving inappropriately with an inmate (*Id.*, ¶ 253).  ADC Defendants state that, if Mr.  Martin had witnessed any inappropriate behavior by Mr. DeWitt, he would have immediately reported it to his superiors (*Id.*, ¶ 254).  ADC Defendants state that Mr. Martin did not learn about the allegations regarding Mr. DeWitt's sexual misconduct with inmates until after Mr. DeWitt's employment with ADC ended (*Id.*, ¶ 255).  ADC Defendants state that Mr. Martin interacted with Mr. DeWitt when he worked for the ADC and never witnessed anything that would lead him to believe Mr. DeWitt was engaging in sexual misconduct with inmates (*Id.*, ¶ 256).  ADC Defendants state that no inmate ever reported to Mr. Martin that Mr. DeWitt was engaging in sexual misconduct with them (*Id.*, ¶ 257).  Ms. Arnett states that she can neither admit nor deny these statements regarding Boyd Martin but adds that this individual was not named in ADC Defendants' April 2023 disclosures nor identified in discovery (*Id.*, ¶¶ 180, 252–257).  Ms. Arnett states that, moreover, whether any

individual had actual or constructive awareness of the substantial risk posed by Mr. DeWitt is a fact question (*Id.*). Ms. Arnett states that this Court has every right to view ADC employee affidavits with skepticism (*Id.*). Ms. Arnett states that, in her initial litigation, ADC Defendants produced two affidavits in support of a dispositive motion which gave the Court pause and raised concerns because they contained demonstrably false statements and/or material omissions (*Id.*).

ADC Defendants state that Dexter Payne is the current Director of the ADC (*Id.*, ¶ 258). ADC Defendants state that Mr. Payne was a Deputy Warden at the North Central Unit from April 2010 to October 2010, a Deputy Warden at the East Arkansas Regional Unit from October 2010 to April 2013, and the Superintendent of the Wrightsville Complex from May 2013 to May 2015 (*Id.*, ¶ 259). ADC Defendants state that, from 2010 to 2015, Mr. Payne visited McPherson on approximately two occasions (*Id.*, ¶ 260). ADC Defendants state that, on the occasions when Mr. Payne was outside Mr. DeWitt's office, he never witnessed Mr. DeWitt behaving inappropriately with an inmate (*Id.*, ¶ 261). ADC Defendants state that, if Mr. Payne had witnessed any inappropriate behavior by Mr. DeWitt, he would have immediately reported it to his superiors (*Id.*, ¶ 262). ADC Defendants state that Mr. Payne did not learn about the allegations regarding Mr. DeWitt's sexual misconduct with inmates until after Mr. DeWitt's employment with ADC ended (*Id.*, ¶ 263). ADC Defendants state that Mr. Payne occasionally interacted with Mr. DeWitt and never witnessed anything that would lead him to believe Mr. DeWitt was engaging in sexual misconduct with inmates (*Id.*, ¶ 264). ADC Defendants state that no inmate ever reported to Mr. Payne that Mr. DeWitt was engaging in sexual misconduct with them (*Id.*, ¶ 265). Ms. Arnett states that she can neither admit nor deny these statements (*Id.*, ¶¶ 180, 258–265). Ms. Arnett states that, moreover, whether any individual had actual or constructive awareness of the substantial risk posed by Mr. DeWitt is a fact question (*Id.*). Ms. Arnett states that this Court has

every right to view ADC employee affidavits with skepticism (*Id.*). Ms. Arnett states that, in her initial litigation, ADC Defendants produced two affidavits in support of a dispositive motion which gave the Court pause and raised concerns because they contained demonstrably false statements and/or material omissions (*Id.*).

ADC Defendants state that Tracey Lawrence has been the Human Resources Manager for the ADC since December 14, 2014, and has been employed in Human Resources with the ADC since 1994 (*Id.*, ¶ 266). ADC Defendants state that Tracey Lawrence reviewed the personnel files of 155 former ADC employees who Ms. Arnett alleges "resigned rather than face termination and/or internal investigation between the years of 2010–2015." (*Id.*, ¶ 267). ADC Defendants state that 111 of the individuals on the list resigned voluntarily and were not under any type of investigation for misconduct or violation of policy (*Id.*, ¶ 268). ADC Defendants state that seven of the individuals on the list were terminated or resigned for failure to report for duty (*Id.*, ¶ 269). ADC Defendants state that 24 of the individuals on the list were terminated or resigned in lieu of termination for policy violations not related to sexual misconduct (*Id.*, ¶ 270). ADC Defendants state that 13 of the individuals on the list were terminated or resigned in lieu of termination for allegations of inappropriate sexual conduct, including sexual harassment (*Id.*, ¶ 271). ADC Defendants state that, of those 13, three were for allegations of improper conduct with another employee, and five, including Mr. DeWitt, were for allegations of improper relationships with former inmates, current parolees, or current probationers (*Id.*). ADC Defendants state that only five of the individuals on the list were terminated based on allegations of an inappropriate relationship with a current inmate, and one of those five was for writing letters to an inmate (*Id.*, ¶ 272). Ms. Arnett states that she can neither admit nor deny these statements but adds that this individual was not named in ADC Defendants' April 2023 disclosures nor identified in discovery

40

(*Id.*, ¶¶ 180, 266–272).  Ms. Arnett states that, moreover, whether any individual had actual or constructive awareness of the substantial risk posed by Mr. DeWitt is a fact question (*Id.*).  Ms. Arnett states that this Court has every right to view ADC employee affidavits with skepticism (*Id.*).  Ms. Arnett states that, in her initial litigation, ADC Defendants produced two affidavits in support of a dispositive motion which gave the Court pause and raised concerns because they contained demonstrably false statements and/or material omissions (*Id.*).  Ms. Arnett states with citation to record evidence that, additionally, this may be evidence of a continued pattern of substandard investigations as identified by the DOJ in 2003 (*Id.*, ¶¶ 268–272).

ADC Defendants state that the ADC has never allowed an individual to resign in lieu of termination to cover up allegations of sexual misconduct (*Id.*, ¶ 273).  Ms. Arnett incorporates a prior response (*Id.*, ¶¶ 180, 273).  Ms. Arnett denies this statement (*Id.*, ¶ 273).  Ms. Arnett states with citation to record evidence that Mr. DeWitt was allowed to resign in lieu of termination regarding his sexual misconduct with Stacey Smith; that although the sexual relationship between the two was a terminable offense, Mr. DeWitt was allowed to resign rather than be terminated; and that by letting Mr. DeWitt resign, ADC Defendants avoided having to conduct an investigation into the matter, and Mr. DeWitt was able to keep his pension (*Id.*).

ADC Defendants state that Mr. Norris did not engage in retaliation against Ms. Arnett (*Id.*, ¶ 274).  Ms. Arnett denies this and states that whether any defendant or individual retaliated against Ms. Arnett is a fact question (*Id.*).

ADC Defendants state that Mr. Hobbs did not engage in retaliation against Ms. Arnett (*Id.*, ¶ 275).  Ms. Arnett denies this and states that whether any defendant or individual retaliated against Ms. Arnett is a fact question (*Id.*).

ADC Defendants state that Ms. Kelley did not engage in retaliation against Ms. Arnett (*Id.*, ¶ 276).  Ms. Arnett denies this and states that whether any defendant or individual retaliated against Ms. Arnett is a fact question (*Id.*).

ADC Defendants state that Mr. Budnik did not engage in retaliation against Ms. Arnett (*Id.*, ¶ 277).  Ms. Arnett denies this and states that whether any defendant or individual retaliated against Ms. Arnett is a fact question (*Id.*).

ADC Defendants state that Ms. Dykes did not engage in retaliation against Ms. Arnett (*Id.*, ¶ 278).  Ms. Arnett denies this and states that whether any defendant or individual retaliated against Ms. Arnett is a fact question (*Id.*).

ADC Defendants state that Ms. Kelley stopped allowing Mr. DeWitt's relatives into McPherson as soon as it was brought to her attention (*Id.*, ¶ 279).  Ms. Arnett denies this statement (*Id.*).

ADC Defendants state that Ms. Arnett's retaliation allegations against Ms. Faust are limited to the time period of July 2020 through May 2021 (*Id.*, ¶ 280).  Ms. Arnett denies this (*Id.*).  Ms. Arnett states with citation to record evidence that she alleges that Ms. Faust retaliated against her when Ms. Faust terminated her December 29, 2014, written statement (*Id.*).  Ms. Arnett states that Mr. Naylor told Ms. Faust to end the investigation but that he did not tell Ms. Faust to terminate active written statements (*Id.*).

All parties admit that Ms. Faust found Ms. Arnett's grievance MCP20–00639 with merit but resolved after counseling the staff member involved (*Id.*, ¶ 281).

ADC Defendants state that Ms. Faust fully investigated the complaints made by Ms. Arnett in grievance MCP20–00668 and found no policy violation (*Id.*, ¶ 282).  ADC Defendants state that Ms. Faust fully investigated and resolved the complaints made by Ms. Arnett in grievance

MCP20–00801 (*Id.*, ¶ 283). ADC Defendants state that Ms. Faust fully investigated the complaints made by Ms. Arnett in grievance MCP20–00951 and found them to be resolved (*Id.*, ¶ 284). ADC Defendants state that Ms. Faust fully investigated the complaints made by Ms. Arnett in grievance MCP20–00959 and found no policy violation (*Id.*, ¶ 285). ADC Defendants state that Ms. Faust fully investigated the complaints made by Ms. Arnett in grievance MCP20–01279 and found no policy violation (*Id.*, ¶ 286). ADC Defendants state that Ms. Faust fully investigated the complaints made by Ms. Arnett in grievance MCP20–01280 and found no policy violation (*Id.*, ¶ 287). ADC Defendants state that Ms. Faust fully investigated the complaints made by Ms. Arnett in grievance MCP21–00518 and found no policy violation (*Id.*, ¶ 288). Ms. Arnett denies that Ms. Faust fully investigated Ms. Arnett's complaints MSP20–00668, MPC20–00801, MCP20–00951, MCP20–00959, MCP20–01279, MCP20–01280, or MCP21–00518 and denies that the referenced documents demonstrate any fullness (*Id.*, ¶¶ 282–288).

All parties admit that Ms. Arnett was removed from the PAWS in Prison program after she filed her complaint (*Id.*, ¶ 289).

ADC Defendants state that Ms. Arnett did not file any grievances relating to her removal from the PAWS in Prison program prior to filing her complaint on May 4, 2021 (*Id.*, ¶ 290). Ms. Arnett states that she can neither admit nor deny this statement (*Id.*).

All parties admit that Ms. Arnett gave Ms. Faust a card in 2015 thanking Ms. Faust for helping her and being there for her after the sexual misconduct of Mr. DeWitt was reported (*Id.*, ¶ 291).

### III.   Legal Standards

### A.    Summary Judgment

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact in dispute and that the defendant is entitled to entry of judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).  "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law."  *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989) (citing *Howland v. Kilquist*, 833 F.2d 639, 642 (7th Cir. 1987)).  However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings.  *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).  The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 447 U.S. at 323.  The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial.  *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997).  "The evidence of the non–movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).

### B.    Claims Pursuant To 42 U.S.C. §1983 And Qualified Immunity

"To state a claim under § 1983, a plaintiff must allege (1) that the defendant acted under color of state law, and (2) that the alleged conduct deprived the plaintiff of a constitutionally protected federal right."  *Van Zee v. Hanson*, 630 F.3d 1126, 1128 (8th Cir. 2011) (citing *Schmidt v. City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009)).

Officials sued under 42 U.S.C. § 1983 in their individual capacities can raise qualified immunity as a defense. This doctrine "shields a government official from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Partlow v. Stadler*, 774 F.3d 497, 501 (8th Cir. 2014). Courts use a two–step inquiry to determine whether qualified immunity applies: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Id.* Courts may begin the analysis with either step. *Greenman v. Jessen*, 787 F.3d 882, 887 (8th Cir. 2015). If a plaintiff cannot satisfy both prongs, then the defendant is entitled to qualified immunity. *See Correia v. Jones*, 943 F.3d 845, 847 (8th Cir. 2019).

## IV.    Discussion

### A.    The Statute Of Limitations

ADC Defendants argue that Ms. Arnett's complaint is barred by the statute of limitations. The limitation period for an action under 42 U.S.C. § 1983 is the state statute of limitations for personal injury actions. *Morton v. City of Little Rock*, 934 F.2d 180, 182–83 (8th Cir. 1991) (citing *Wilson v. Garcia*, 471 U.S. 261 (1985)). In Arkansas the applicable period for a personal injury § 1983 action is three years. Ark. Code Ann. § 16–56–105.

The Arkansas savings statute, Ark. Code Ann. § 16–56–236, as interpreted by the Arkansas Supreme Court, also applies to § 1983 actions arising in Arkansas. *Whittle v. Wiseman*, 683 F.2d 1128, 1129 (8th Cir. 1982). The savings statute states that, "[i]f any action is commenced within the [the three–year limitations period], and the plaintiff therein suffers a nonsuit . . . the plaintiff may commence a new action within one (1) year after the nonsuit suffered." Ark. Code Ann. § 16–56–126(a)(1). Nonsuits under Arkansas law include voluntary dismissals without prejudice.

*See White v. Perry*, 74 S.W.3d 628, 631 (Ark. 2002) (using the word "nonsuit" to describe voluntary dismissals without prejudice governed by Arkansas Rule of Civil Procedure 41(a)).

This means that a § 1983 plaintiff in Arkansas whose previous complaint was filed and timely served within the three–year statute of limitations period, but was then dismissed without prejudice, may refile that case within one year from the date of the dismissal.  Ark. Code Ann. § 16–56–126(a)(1); *Tucker v. Sullivant*, 370 S.W.3d 812, 814 (Ark. 2010) (explaining that timely service is required to take advantage of the savings statute).

Ms. Arnett filed her original complaint based on the allegations that are the subject of this case on September 7, 2017 (Case No. 1:17–cv–00076–KGB, Dkt. No. 1).  Ms. Arnett's case was voluntarily dismissed without prejudice on May 4, 2020, then refiled on May 4, 2021, within the time period allotted by the Arkansas savings statute (Dkt. No. 1, ¶ 2).

ADC Defendants argue that some or all of Ms. Arnett's complaint should be barred by the statute of limitations (Dkt. Nos. 39, at 5–7; 50, at 2–3).  Mr. DeWitt began sexually assaulting Ms. Arnett in December 2010 (Dkt. No. 49, ¶ 31).  Viewing the factual record in the light most favorable to Ms. Arnett, the nonmoving party, a reasonable jury could conclude that Mr. DeWitt sexually assaulted Ms. Arnett for the last time on September 9, 2014 (Dkt. No. 48-16, ¶ 4).  Ms. Arnett filed her original complaint on September 7, 2017, meaning that claims based on events that occurred before September 7, 2014, are outside of the three–year limitations period (Case No. 1:17–cv–00076–KGB, Dkt. No. 1).

Ms. Arnett also maintains that record evidence when construed in her favor establishes that acts continued into early-to-mid 2015, including that Mr. DeWitt threatened Ms. Arnett not to report his abuse or that she would destroy the entire PAL program (Dkt. No. 8-1, at 226:22–227:8). Ms. Arnett also maintains that there is record evidence when construed in her favor that establishes

Mr. Yancey, when he took over the PAL program after Mr. DeWitt, warned Ms. Arnett in an interoffice ADC memo about complaining about Mr. DeWitt's abuse and about complaining that Mr. DeWitt's family was allowed to continue involvement in the PAL program after the allegations of Mr. DeWitt's sexual abuse were known to McPherson supervisors (Dkt. No. 48-28).

Moreover, there is a limited exception to the statute of limitations in situations that involve a continuing violation. *Pub. Water Supply Dist. No. 1 of Greene Cnty. v. City of Springfield*, 52 F.4th 372, 375 (8th Cir. 2022). Under the continuing violations doctrine "each overt act that is a part of a continuing violation 'starts the statutory period running again.'" *Id.* (quoting *Izaak Walton League of Am., Inc. v. Kimbell*, 558 F.3d 751, 759 (8th Cir. 2009)). "However, 'acts that are merely unabated inertial consequences (of a single act)' do not reset the statute of limitations." *Id.* (quoting *Kimbell*, 558 F.3d at 759). A continuing violation does not excuse a plaintiff from complying with the applicable statute of limitations—it simply allows the plaintiff to include, in an initial complaint, allegedly unconstitutional acts that occurred before the limitations period, provided that at least one of the acts complained of falls within the limitations period. *Zotos v. Lindbergh Sch. Dist.,* 121 F.3d 356, 362 (8th Cir. 1997).

ADC Defendants first argue that Ms. Arnett's entire complaint is barred by the statute of limitations because the "continuing violation" exception is narrow and should not apply here (Dkt. No. 39, at 6). ADC Defendants also argue, in the alternative, that any claims based on incidents of sexual misconduct before September 7, 2014, should be barred, even if claims based on incidents between September 7, 2014, and September 9, 2014, are not (Dkt. No. 50, at 3).

The Court determines that the facts of this case describe a continuing violation. The allegations are that Ms. Arnett was called to Mr. DeWitt's office and sexually assaulted on a weekly basis (Dkt. No. 49, ¶ 29). Viewing the record evidence in the light most favorable to Ms.

Arnett, this last sexual assault occurred on September 9, 2014, which is within the statute of limitations (Dkt. No. 48-16, ¶ 4). When Mr. DeWitt sexually assaulted Ms. Arnett on September 9, 2014, he committed an overt act that was part of a continuing series of violations beginning in December 2010. *City of Springfield*, 52 F.4th at 375. Such overt acts start the statutory period running again. *Id.* Therefore, for these reasons, the Court concludes that Ms. Arnett's complaint is not barred by the statute of limitations.

### B.      Failure To Protect Claims

### 1.      Legal Standard Under Eighth Amendment

When raising her failure to protect claim, Ms. Arnett cites the Eighth and Fourteenth Amendments (Dkt. No. 1, ¶ 218). Because she was convicted and incarcerated pursuant to that conviction at the time of the events giving rise to her claims, her claims are properly evaluated under the Eighth Amendment, not the Fourteenth Amendment. *See Berry v. Oswalt*, 143 F.3d 1127, 1131 (8th Cir. 1998) (examining Eighth Amendment claims); *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007) (examining Fourteenth Amendment claims). Ms. Arnett argues that ADC Defendants violated the Eighth Amendment by failing to protect her from Mr. DeWitt's sexual assaults (Dkt. No. 48, at 2).

The Eighth Amendment prohibits the infliction of cruel and unusual punishment. U.S. Const. amend. VIII. "'[T]he treatment a prisoner receives in prison and the conditions under which [she] is confined are subject to scrutiny under the Eighth Amendment.'" *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Helling v. McKinney,* 509 U.S. 25, 31 (1993)). Prison officials must provide humane conditions of confinement, including protecting inmates from violence. *See Jensen v. Clarke*, 94 F.3d 1191, 1197 (8th Cir. 1996). Unnecessary and wanton inflictions of pain, including inflictions of pain without penological justification, "'constitute[ ] cruel and

unusual punishment forbidden by the Eighth Amendment.'"  *Hope v. Pelzer*, 536 U.S. 730, 737 (2002) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).  "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offense against society.'" *Farmer*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

The Eighth Circuit has held on multiple occasions that the sexual assault of an inmate by prison staff violates the inmate's constitutional right to be free from cruel and unusual punishment.  *See Williams v. Prudden*, 67 Fed. Appx. 976, 977 (8th Cir. 2003) (per curiam) (holding that an inmate "sufficiently stated an Eighth Amendment claim by alleging that [the guard] forcibly ground his pelvis against her, grabbed her breast, verbally demanded sexual favors, made physical sexual advances, and attempted to force himself upon her"); *Berryhill v. Schriro*, 137 F.3d 1073, 1076 (8th Cir. 1998) ("Certainly, sexual or other assaults [by civilian prison employees] are not a legitimate part of a prisoner's punishment, and the substantial physical and emotional harm suffered by a victim of such abuse are compensable injuries.").

However, a prison official sued in his or her individual capacity "may not be held liable under § 1983 for the constitutional violations of a subordinate on a *respondeat superior* theory." *Ambrose v. Young*, 474 F.3d 1070, 1079 (8th Cir. 2007) (internal quotation marks omitted) (quoting *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001)).  To prevail on a claim for failure to protect, a prisoner must demonstrate:  (1) that they are incarcerated under conditions posing a substantial risk of serious harm and (2) that the prison officials subjectively knew of and disregarded that safety risk.  *Farmer*, 511 U.S. at 834–35; *see also Jensen v. Clarke*, 94 F.3d 1191, 1197 (8th Cir. 1996) (explaining the two essential requirements necessary to state a failure–to–protect case).

First, the conditions that result from the failure to protect the inmate must pose a substantial risk of serious harm to the inmates. *Farmer*, 511 U.S. at 834. "A risk of sexual assault is 'substantial' if it 'occur[s] with sufficient frequency that prisoners are put in reasonable fear for their safety.'" *Dean v. Bearden*, 79 F.4th 986, 989 (8th Cir. 2023) (alteration in original) (quoting *Vandevender v. Sass*, 970 F.3d 972, 977 (8th Cir. 2020). "This objective requirement ensures that the deprivation is sufficiently serious to amount to a deprivation of constitutional dimension." *Jensen,* 94 F.3d at 1197. An obvious risk of a harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmates. *See Hope*, 536 U.S. at 738. Nevertheless, "[a] single incident, or a series of isolated incidents, usually provides an insufficient basis upon which to assign supervisor liability." *Howard v. Adkison*, 887 F.2d 134, 138 (8th Cir. 1989). "However, as the number of incidents grow[s], and a pattern begins to emerge, a finding of tacit authorization or reckless disregard becomes more plausible." *Id*.; *see also Lenz v. Wade*, 490 F.3d 991, 995–96 (8th Cir. 2007).

Second, the subject prison official must have exhibited a sufficiently culpable state of mind, that is, the prison official must have been deliberately indifferent to a substantial risk of serious harm to the inmates. *See Farmer*, 511 U.S. at 834.

> "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

*Id.* at 837. "This subjective state of mind must be present before a plaintiff can be successful because only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." *Blades v. Schuetzle*, 302 F.3d 801, 803 (8th Cir. 2002) (internal quotation marks omitted) (quoting *Jensen v. Clarke*, 73 F.3d 808, 810 (8th Cir. 1996)). This requisite state of mind is akin to

recklessness, which is "more blameworthy than negligence," yet less blameworthy than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmates. *See Farmer*, 511 U.S. at 835, 839–40.

### 2.      Analysis

Based on the record evidence before the Court, and viewing the record evidence in the light most favorable to the nonmoving party Ms. Arnett, there is a genuine issue of material fact in dispute regarding what indications of Mr. DeWitt's sexual abuse about which certain of the ADC Defendants—Ms. Faust, Mr. Budnik, and Ms. Dykes—were aware.  A reasonable jury viewing the record evidence and all reasonable inferences drawn therefrom in favor of Ms. Arnett could conclude that each of these three defendants were deliberately indifferent to the substantial risk of harm posed by Mr. DeWitt.  Even viewing the record evidence in the light most favorable to Ms. Arnett, this Court determines that there is no genuine issue of material fact in dispute regarding what indications of Mr. Dewitt's sexual abuse about which the remaining ADC Defendants—Mr. Norris, Mr. Hobbs, and Ms. Kelley—were aware, and the Court concludes that no reasonable jury could determine that these remaining ADC Defendants—Mr. Norris, Mr. Hobbs, and Ms. Kelley––were deliberately indifferent to the substantial risk of harm posed by Mr. DeWitt.

### a.      Record Evidence Pertinent To Claim

ADC Defendants assert that Ms. Arnett has no record evidence to support an assertion that ADC Defendants had notice of a pattern of sexual misconduct by staff within McPherson that created a risk of harm generally (Dkt. No. 39, at 10).  The Court examines certain record evidence relevant to this assertion and then examines this claim as to each ADC Defendant.

### 1.      Pattern Of Conduct

It is undisputed that Mr. DeWitt sexually assaulted Ms. Arnett on a weekly basis beginning in December 2010 (Dkt. No. 49, ¶ 28–29).  From the record evidence, these assaults occurred at the same time in the morning and on the same day each week (*Id.*, ¶ 29).  A reasonable jury could conclude based on the record evidence before the Court that the last assault of Ms. Arnett occurred on September 9, 2014 (Dkt. No. 48-16, ¶ 4).

Mr. DeWitt also sexually assaulted two other women over several years before he was placed on leave on September 9, 2014, and resigned on September 10, 2014 (Dkt. No. 48-10, at 1–2, 7).  For each victim, he used a similar method in which the women were called to his office from the barracks early in the morning during the prisoner count (Dkt. Nos. 48-11, at 23:12–24:20; 48-2, at 41:6–49:8).  Leticia Villarreal, one of Mr. DeWitt's other victims, described Mr. DeWitt's methods.  As Ms. Villareal described it, she was called to meet Mr. DeWitt at his office (Dkt. No. 48-2, at 41:6–11).  Ms. Arnett and Mr. DeWitt's third victim, Leslie Makool, were also present in his office (*Id.*, at 41:17–21).  At the meeting, Mr. DeWitt told Ms. Villarreal that she was going to start receiving new training with him (*Id.*, at 41:8–11).  Mr. DeWitt told Ms. Villarreal that she was going to come to his office at 6:00 a.m. on Monday morning (*Id.*, at 41:1–14).  She had previously been to his office to complete paperwork related to the PAL program but never at that time in the morning (*Id.*).  At 6:00 a.m. an officer would call her name and tell her to go to the Chaplain's office (*Id.*, at 44:15–21).

On the first Monday when Ms. Villarreal was called to Mr. DeWitt's office, he told her that she was privileged to be receiving special training from him and about how "God wanted women to be submissive and to be a be a helper for the man." (*Id.*, at 46:6–7).  Mr. DeWitt then told Ms. Villarreal that she was attracted to him and that she had a look on her face like she wanted

to be touched (*Id.*, at 47:5–7).  Ms. Villarreal told Mr. DeWitt that he was wrong; he began touching her, and she told him to stop; and then he sexually assaulted her (*Id.*, at 47:8–19).

On this first Monday, Mr. DeWitt did nothing to obstruct the view through the windows into his office (*Id.*, at 47:20–48:7).  However, on the following Mondays, Mr. DeWitt would arrange boxes, a cabinet, and other materials to block both the view through the main window and the small window on the entrance door (*Id.*).  For Ms. Villarreal, this abuse occurred weekly for 18 months (*Id.*, at 49:22–50:8).  Ms. Villarreal described in her deposition an incident in which she tried to get away from Mr. DeWitt by leaving the Chaplain Office that angered Mr. DeWitt to the point that it caused him to follow her into her room in the barracks, shout at and threaten her, and demand she return to his office (*Id.*, at 56:23–57:7).  Ms. Villarreal testified a Correctional Officer observed all of this, offered to pepper spray Ms. Villarreal and then wrote Ms. Villarreal a disciplinary (*Id.*, at 57:20–58:4).  The record evidence includes a statement from the Correctional Officer Phillip Allen regarding this event and his impressions of it (Dkt. Nos. 48-25; 48-26).

Further, fellow inmate Ms. Nicholson, who is not trained on PREA, told investigators that she could detect a change in the three inmates who were abused by Mr. DeWitt during their years of abuse, describing that they looked forward to counseling at the beginning but over time grew apprehensive (Dkt. No. 48-24, at 3).  She described observing Ms. Arnett and Ms. Villarreal trying to leave the pod before they were summoned by Mr. Dewitt (*Id.*).  She noted a drastic change in Ms. Arnett, telling the investigator that she noticed this more with Ms. Arnett, adding that "she was just a basket case the last nine months before [Mr. Dewitt] left." (*Id.*, at 4).

Ms. Arnett's December 29, 2014, partial statement and Jennifer Smith's December 21, 2024, email account of her conversation with both Ms. Villarreal and Ms. Arnett provide a similar account of Mr. Dewitt's methods (Dkt. No. 48-10, at 7).  Ms. Arnett was called to Mr. DeWitt's

office for individual meetings in the morning during the prisoner count, Mr. DeWitt made increasingly sexual comments during these meetings, and then began to sexually assault Ms. Arnett (Dkt. Nos. 48-10, at 7; 48-32).

A reasonable jury could conclude from this record evidence that Ms. Villarreal's account of Mr. DeWitt's abuse was true, and when considered together with the other record evidence before the Court, that it was representative of his method of abusing Ms. Arnett and Ms. Makool as well.  In her partial statement written on December 29, 2014, Ms. Arnett recounts walking into the Chaplain's Office where she caught Mr. DeWitt having sex with Ms. Makool (Dkt. No. 48-32, at 1).  Ms. Arnett also recounts in that statement walking up to "the door" and seeing Mr. DeWitt with Ms. Villareal "acting out sexually" (*Id.*, at 2).  There is record evidence that if believed by a jury indicates others within McPherson, including Correctional Officers and fellow inmates, observed outward behaviors and changes in behaviors among Mr. DeWitt and his victims that indicted there was something amiss with those relationships.

## 2.    DOJ Investigation

A 2003 investigation of the McPherson Unit by the DOJ pursuant to CRIPA identified deficits in the ADC's administration of McPherson, including failure to comply fully with PREA (Dkt. Nos. 49, ¶ 65; 48-13).  In 2004, the DOJ and ADC entered into a Memorandum of Agreement that, among other goals, sought to resolve issues identified by the DOJ's investigation related to sexual assault at McPherson (Dkt. No. 48-13, at 41–50).  Between 2012 and 2015, the ADC was not completely compliant with PREA and did not conduct official PREA audits (Dkt. No. 48-4, at 31:18–32:21).  Ms. Kelley, the then-ADC director, recommended to then-Governors Mike Beebe and Asa Hutchinson that ADC not comply with PREA to avoid paying for a PREA-certified auditor (Dkt. No. 49, at ¶ 64).  Based on the record evidence before the Court, a reasonable jury

could conclude that some of the deficits identified in the 2003 DOJ investigation, including failure to comply fully with PREA, had still not been remedied during the period of time when Mr. DeWitt was sexually assaulting Ms. Arnett.

Ms. Arnett presents record evidence of a June 11, 2015, press article that refers to a DOJ press release in which the DOJ announced that it would initiate another CRIPA investigation of McPherson and declared the investigation focus to be "whether women confined at McPherson have been subjected to sexual abuse and sexual harassment by correctional staff." (Dkt. No. 48-14, at 1). It was reported that the DOJ stated it had received numerous allegations of sexual abuse and sexual harassment of prisoners by multiple members of McPherson staff (*Id.*). According to the DOJ, the allegations against McPherson staff members were: (a) sexual intercourse and other sexual acts with prisoners; (b) exchanging commissary money for sexual favors; (c) inappropriately watching prisoners while they shower or change clothes; (d) commenting on inmates' private parts and; (e) at times, taking photos or video of inmates for reasons unrelated to correctional goals (*Id.*). Of McPherson in 2015, it was reported that the DOJ believed there "appear[ed] to be a pattern or practice of such violations" (*Id.*).

### 3.       Other Accusations

Ms. Arnett argues based on her personal knowledge that there were multiple accusations of sexual harassment against Mr. DeWitt made before he began abusing her in 2010 (Dkt. No. 48, at 26). Ms. Arnett testified that she learned from documents and conversations while she was a clerk in the PAL program that an inmate named Marcie Coburn accused Mr. Dewitt of sexual assault in 2001 or 2002, was subsequently removed from the program, and was moved to an area called the Special Programs Unit, a small "mental health area" of the prison that does not allow the inmates in it out to the rest of the compound (Dkt. No.48-1, at 39:16–43:17; 45:18–46:5). Ms.

Arnett stated that Ms. Coburn was kept in this restrictive area for two years and then transferred to another unit (*Id.*, at 46:10–14).  Ms. Arnett stated that she discussed these accusations at the time with Mr. DeWitt; with Stacey Smith, who was another inmate and later, after being released, was a volunteer with the PAL program (Dkt No. 49, ¶¶ 23, 24); with Ms. Nicholson, who was another inmate (Dkt. No. 48-1, at 23:2–8); and with Jennifer Smith, who was a volunteer chaplain (Dkt. No. 49, ¶ 38).  Ms. Arnett stated that she knows reports of the accusations went to Major Linda Dixon (Dkt. No. 48-1, at 43:18–45:17).  The Court notes that Major Dixon is no longer a defendant in this case (Dkt. No. 30).

Ms. Arnett stated that she is aware of another pre–2010 sexual harassment allegation against Mr. DeWitt, this one by a PAL clerk named Jen Mathis, because she was present when a clerk typed up the allegations and when Mr. DeWitt signed them (Dkt. No. 48-1, at 48:12–49:12).  A document produced by the ADC in discovery includes a memorandum dated January 30, 2006, in which Mr. DeWitt describes Ms. Mathis' complaint as being about "improper sexual content in the training in the areas of impure thoughts." (Dkt. No. 48-30, at 1).  The document is on ADC letterhead (*Id.*).  According to Ms. Arnett, the documents were produced in discovery by ADC Defendants (Dkt. No. 48, at 29).  A document that appears to the Court to be in part a summary and in part a transcript of a conversation in which Mr. DeWitt confronts Ms. Mathis about her accusations is attached to this memorandum (Dkt. No. 48-30, at 2–4).  This document records statements by Mr. DeWitt to Ms. Mathis that imply there was sexual content in his teaching (*Id.*).  Mr. DeWitt stated, "[d]uring the training there is an affection and with that affection there comes thoughts and temptations and these come in order to help." (*Id.*, at 3).  Throughout the document, Mr. DeWitt accuses Ms. Mathis of "being out to get his job" and appears to the Court be exerting pressure on Ms. Mathis to blame herself for complaining about Mr. DeWitt's behavior (*Id.*, 2–4).

The Court acknowledges that ADC Defendants take the position that Ms. Arnett and Mr. DeWitt did not report this incident to anyone at ADC (Dkt. No. 39, at 11).

Ms. Arnett further stated that other Chaplains came to the office to do investigations related to Mr. DeWitt's teachings and interactions with inmates on three different occasions (Dkt. No. 48-1, at 51:2–3).  On one occasion, Chaplain Mark Wheeler came to the unit to speak with inmates about Mr. DeWitt's teachings as part of an investigation when Mr. DeWitt was accused of talking with inmates about their menstrual cycles (*Id.*, at 54:24–55:11).  Mr. DeWitt was also questioned about his menstrual cycle comments by then–Warden Maggie Capel (Dkt. No. 48-3, at 194:15–17).  Mr. DeWitt testified that, as a Chaplain at McPherson, he gave lessons that talked about the subject of masturbation to inmates (*Id.*, at 200:8–22).

Ms. Arnett stated that Mr. DeWitt told her about a prison sergeant who was caught with an inmate under his desk, apparently engaging in sexual activity (Dkt. No 48-1, at 61:10–62:13).  The inmate confirmed this sergeant's sexual misconduct with Ms. Arnett (*Id.*).  Mr. DeWitt remarked to Ms. Arnett that the situation made him nervous but did not elaborate (*Id.*).  Ms. Arnett stated that the sergeant no longer worked at McPherson after the incident but that he did not have criminal charges brought against him (*Id.*).

### 4.     Practices At McPherson

Further, there is record evidence that Mr. DeWitt was permitted to "counsel" or "talk about spiritual things" with staff, including the same staff that should have been monitoring and reporting any suspicions regarding Mr. DeWitt's conduct with inmates (Dkt. No. 48-6, 28–29).  Ms. Faust testified to this (*Id.*).  In addition, there is record evidence that Mr. DeWitt's son who was a McPherson Correctional Officer from August 2012 to March 6, 2015, was responsible for monitoring Mr. DeWitt's office corridor and reporting any suspicions about Mr. DeWitt's conduct

with inmates, inappropriate window coverings, or policy violations (Dkt. Nos. 48-12; 48-6, at 31). Ms. Faust testified as to this (Dkt. No. 48-6, at 31).

According to Ms. Faust, it is important that staff members to feel comfortable reporting each other if they see misconduct and that there is an institutional structure in place to facilitate that responsibility (*Id.*, at 110:16–24).  Ms. Faust acknowledges that Correctional Officers are charged with monitoring the hallways at McPherson and looking through windows into various staff offices for security purposes (Dkt. No. 48-6, at 117:3–5).  Ms. Arnett argues that a reasonable jury could believe that these practices made it less likely complaints would be received about Mr. DeWitt.

There also is record evidence that Mr. DeWitt served for years on the Classification Committee at McPherson.  Classification refers to the process whereby a panel headed by a chairperson, the Warden or Deputy Warden, "classifies" an inmate which, in turn, determines where the inmate will be permitted to work or in which prison programs the inmate will be allowed to participate.  The committee assigns inmates jobs and makes recommendations for work release, housing, and programs (Dkt. No. 48-7, at 39:3–9).  Only Wardens and Deputy Wardens can chair the Classification Committee (Dkt. No. 48-6, at 228:4–9).  While some prison positions are expressly referenced as eligible for Classification Committee membership, chaplain is not one of them (Dkt. No. 48-7, at 40:7–20).  Mr. Budnik sat on a Classification Committee with Mr. DeWitt (*Id.*, at 52:16–18).  Ms. Faust is unaware of any time where an outcome decided by Mr. DeWitt was overruled (Dkt. No. 48-6, at 230:1–12).  Mr. DeWitt was on the Classification Committee with the same people for a long time, forging professional relationships with them (Dkt. No. 48-3, at 213:16–23).  Ms. Arnett argues that a reasonable jury could believe that these practices also made it less likely complaints would be received about Mr. DeWitt.

Finally, there is record evidence that there was an issue at McPherson in 2010—the year Mr. DeWitt began abusing Ms. Arnett—where staff members executed inmate counts incorrectly (Dkt. No. 48-6, at 126:2–4). Specifically, Ms. Dixon's inmate counting process was flawed, based on McPherson disciplinary documents (Dkt. No. 48-6, at 128:10–21). In 2009 or 2010, Ms. Faust found that Ms. Dixon failed to inspect and detect the inadequate count process utilized at McPherson, failing to review the count files for accuracy and completeness (Dkt. No. 48-6, at 130:1–10). Ms. Arnett argues that this is relevant because Mr. DeWitt committed his sexual abuse of three inmates routinely during early morning inmate counts (Dkt. No. 48-1, at 225:13–19). Further, Ms. Faust acknowledges that when the inmate count process is flawed, it can render the count numbers incomplete or inaccurate, which is a security concern, and a flawed count process can create opportunities that can be manipulated (Dkt. No. 48-6, at 128:10–129:1). Despite the unreasonable risk to prison inmates caused by the problem, Ms. Faust testified that Ms. Dixon, her chief of security, was never disciplined for her improper inmate counting (Dkt. No. 48-6, at 126:22–127:2). Ms. Arnett argues that a reasonable jury could believe that these practices, and the failure to discipline them, also made it less likely complaints would be received about Mr. DeWitt and his misconduct and assaults.

### b.     Failure To Protect Claim Against Larry Norris

Larry Norris was the Director of the ADC from December 1993 through January 2010, before Mr. DeWitt began sexually assaulting Ms. Arnett in December 2010 (Dkt. No. 49, ¶ 2). Mr. Norris was the Interim Director of the ADC from November 2014 through January 2015, after the last assault by Mr. DeWitt of Ms. Arnett which this Court determines based on record evidence that a reasonable jury could conclude occurred on September 9, 2014 (*Id.*). Mr. Noris was not employed at the ADC from February 2010 through October 2014 (*Id.*, ¶ 3).

No reasonable jury could determine that Mr. Norris, who was not employed by the ADC during the period when the assaults took place, was deliberately indifferent to a substantial risk of harm created by Mr. DeWitt. Though a reasonable jury could conclude that Mr. Norris failed to remedy all the PREA violations discovered by the 2003 DOJ investigation before his tenure as ADC Director ended in December 2010, this would rise at most to the level of negligence which is insufficient to ground supervisory liability for an Eighth Amendment violation. *See Farmer*, 511 U.S. at 835, 839–40. The Court grants ADC Defendants' motion for summary judgment with respect to Ms. Arnett's claim for failure to protect against Mr. Norris.

### c.      Failure To Protect Claim Against Ray Hobbs

Ray Hobbs was the Chief Deputy Director of the ADC from 2001 to January of 2010, the Interim Director of the ADC from January 2010 to June 2010, and the Director of the ADC from June 2010 to October 2014 when he retired (Dkt. No. 49, ¶ 11). Based upon the record evidence before the Court, during his time as Chief Deputy Director, McPherson was not one of the units Mr. Hobbs supervised (*Id.*, ¶ 12).

In 2008, Mr. Hobbs was tasked with the coordination and implementation of PREA within the ADC (*Id.*, ¶ 65). Mr. Hobbs attended several national PREA conferences and the National Institute of Corrections for PREA training during his time with the ADC (*Id.*, ¶¶ 66).

During the period of time that Mr. Hobbs was ADC Director or interim director, Mr. Hobbs estimates that he walked the physical premises of McPherson between five and 10 times (Dkt. No. 38-6, at 40:2–8). Mr. Hobbs testified when deposed that during these visits he paid attention to camera blind–spots and other physical aspects of the facility that could raise a concern related to PREA and sexual abuse, and he did not notice any such problems (*Id.*, at 40:10–43:10). Mr. Hobbs stated that, if he had seen any such issues, he would have corrected them (*Id.*, at 43:13–44:5).

Though a reasonable jury could conclude that some PREA violations discovered by the 2003 DOJ investigation were not remedied in 2012 during Mr. Hobbs' tenure as ADC director, this would rise at most to the level of negligence which is insufficient to ground supervisory liability for an Eighth Amendment violation. *See Farmer*, 511 U.S. at 835, 839–40. No reasonable jury could conclude based on this general 2012 plan to improve PREA compliance that Mr. Hobbs had sufficient knowledge of the risk created by Mr. DeWitt or was reckless with regard to the risk created by Mr. DeWitt. *Id.* The Court grants ADC Defendants' motion for summary judgment with respect to Ms. Arnett's claim for failure to protect against Mr. Hobbs.

### d.        Failure To Protect Claim Against Wendy Kelley

Wendy Kelley was Deputy Director of the ADC from February 2006 through January 2014, Chief Deputy Director of the ADC from January 2014 through January 2015, Director of the ADC from February 2015 through June 2019, and Secretary of the Department of Corrections from July 2019 through July 2020 (Dkt. No. 49, at ¶ 5). As Deputy Director, Ms. Kelley was in the chain of command over Mr. DeWitt, though she did not directly supervise him according to the ADC Defendants (*Id.*, ¶¶ 6, 18). Ms. Arnett neither confirms nor denies this allegation (*Id.*). As Deputy Director, Ms. Kelley met with staff who reported to her regularly, required staff to submit monthly reports, reviewed their policies annually, engaged in unannounced visits when she got a complaint about something that was concerning, and routinely visited the units (*Id.*, ¶ 7).

In March 2006, Ms. Kelley held a meeting with Mr. DeWitt at McPherson after McPherson Deputy Warden Maggie Capel brought to Ms. Kelley's attention allegations that Mr. DeWitt was allegedly telling inmates that they had to stay in abusive relationships (Dkt. No. 48-4, at 132:1–133:16). At the meeting, as described in a memo from Chaplain Sensat to Mr. DeWitt, Mr. DeWitt agreed not to tell inmates:

> 1. They will go to hell for homosexual thoughts or feelings.  2. They must stay married in an abusive relationship or they will go to hell if they divorce an abusive spouse.  3. They cannot remarry.   4. That God does not speak to them, but only to you, and after God speaks to you, then you will tell them what God has to say.  5. That the inmate must/should confess their sins to you.  6. That everyone must share your religious beliefs.

(Dkt. No. 48-20).  At the meeting, the ADC Defendants contend that Ms. Kelley instructed Mr. DeWitt to stop teaching inmates to submit to their husbands and told him that she would fire him if he continued (Dkt. No 49, at ¶ 147).  Ms. Arnett neither confirms nor denies this allegation (*Id.*). Ms. Kelley made sure that Ms. Capel knew that Ms. Kelley expected her to monitor the situation and make sure that Mr. DeWitt did not continue making such statements (*Id.*, ¶ 149).  It is undisputed that Ms. Kelley did not learn of the allegations about Mr. DeWitt's sexual assaults of Ms. Arnett until sometime over the weekend of December 20 to 21, 2014 (*Id.*, ¶ 44).

From the record evidence before the Court, a reasonable jury could not find that Ms. Kelley was deliberately indifferent to an unreasonable risk of harm to Ms. Arnett created by Mr. DeWitt. It is undisputed that Ms. Kelley was in the chain of command over Mr. DeWitt, though she was not his direct supervisor according to ADC Defendants, and that according to ADC Defendants she received reports from McPherson staff, at times conducting unannounced visits and routinely visiting the units (*Id.*, ¶ 7).  There is no record evidence that Ms. Kelley did not conduct unannounced visits, did not routinely visit the units, or that she learned anything from these reports or visits that could lead a jury to conclude that Ms. Kelley had knowledge of Mr. DeWitt's sexual assaults or was reckless with regard to the fact that those assaults were happening.  Ms. Kelley's knowledge of the 2003 DOJ investigation and of Mr. DeWitt's teachings in 2006 is also not sufficient evidence to have put Ms. Kelley on notice of the danger Mr. DeWitt posed.

Based on the record evidence before the Court, construing all reasonable inferences from the evidence in favor of Ms. Arnett, the Court concludes that a reasonable jury could not conclude

that Ms. Kelley possessed a state of mind akin to recklessness or knowledge with regard to Mr. DeWitt's sexual assaults. *See Farmer*, 511 U.S. at 835, 839–40. The Court grants ADC Defendants' motion for summary judgment with regard to Ms. Arnett's claim for failure to protect against Ms. Kelley.

### e.      Failure To Protect Claim Against Nurzuhal Faust

Nurzuhal Faust began working at the ADC in 2021, was Deputy Warden at McPherson from April 2009 to March 2015, and Warden at McPherson from 2020 through the present (Dkt. No. 49, ¶ 15). There is record evidence that Ms. Faust learned of the allegation against Mr. DeWitt on December 29, 2014 (*Id.*, ¶ 48). Ms. Faust testified that she was never made aware of any allegations related to sexual abuse against Mr. DeWitt prior to this (Dkt. No. 48-6, at 54:10–16).

However, record evidence and reasonable inferences from that evidence viewed in the light most favorable to Ms. Arnett could lead a reasonable jury to conclude that Ms. Faust had knowledge of Mr. DeWitt's sexual assaults or was reckless with regard to the fact that those assaults were happening. There is record evidence that, when Ms. Faust was a Deputy Warden at McPherson from 2014 to 2015, she oversaw the prison chaplaincy program (Dkt. No. 48-7, at 16:25–17:4). There is record evidence that it was Ms. Faust's responsibility to monitor prison chaplains during that time (Dkt. No. 48-6, at 114:4–17; 127:6–7). There is record evidence that chaplains are subordinates of Deputy Wardens and that Deputy Wardens may give chaplains orders regarding security issues (Dkt. No. 48-7, at 17:21–23, 18:16–25).

Mr. DeWitt's office has two windows, one window in the door known as a "PREA window," and one additional window in the wall on the same side of the room as the door (Dkt. Nos. 49, ¶ 142; 38–34). Ms. Faust testified when deposed that ADC policy prohibits employees from obstructing the PREA window (Dkt. No. 48-6, at 68:11–79:5). Her answers regarding the

non–PREA window were less clear (*Id.*).  Ms. Faust testified at one point that she believes the prohibition on obstructing windows applies only to PREA windows (*Id.*, at 68:20–24).  Later, she testified that windows are not to be obstructed at all (*Id.*, at 79:3–5).  Ms. Faust testified that she has walked the hallways of McPherson and told staff to take down obstructions that she saw covering windows (*Id.*, at 75:1–14).  Ms. Faust testified when shown a photo of Mr. DeWitt's office, recreated to demonstrate what a partial obstruction of the window might have looked like, that such a partial obstruction would violate policy and that, if ADC staff saw it, they should report it (*Id.*, at 79:18–80:21).  Ms. Faust testified that she never saw either window in Mr. DeWitt's office partially obstructed in such a way (*Id.*, at 81:3–6).

Ms. Faust testified that she would walk by his office between 2010 and 2014 (*Id.*, at 81:7–10).  ADC Defendants state that, from 2010 through 2015, Ms. Faust's office as Deputy Warden was not located near Mr. DeWitt's office (Dkt. No. 49, ¶ 164).  However, Ms. Faust stated that her office was about 25 or 30 feet away from Mr. DeWitt's office, in the same hallway and on the same side of the hallway (Dkt. No. 48-–6, at 65:4–14; 81:7–10).  Ms. Faust testified that she would visit Mr. DeWitt's office approximately once per week and that he was sometimes alone with female inmates when she did (*Id.*, at 83, 10–14:7).  Further, Ms. Faust sometimes started her Deputy Warden shift between 5:45 a.m. and 6:00 a.m. (*Id.*, at 102:1–6).  She was therefore aware from 2010 through 2014 that Mr. Dewitt had early morning visits with his three inmate victims (*Id.*, at 102:19–22).

There is a genuine dispute of material fact regarding whether Ms. Faust saw the windows to Mr. DeWitt's office obstructed or whether she saw Mr. DeWitt sexually assaulting his three inmate victims, if the windows were not obstructed, given the record evidence.  ADC Defendants argue that Ms. Faust never saw Mr. DeWitt's window obstructed.  There is record evidence that,

for years, Mr. DeWitt in fact covered the window to his office three times per week when he assaulted Ms. Arnett and his other two victims.  This evidence and Ms. Faust's equivocation in answering questions about obstructions of windows, combined with Ms. Faust's testimony that her office was 25 to 30 feet away from Mr. DeWitt's office in the same hallway, and that Ms. Faust walked by Mr. DeWitt's office with regularity and at the hours of the morning the record evidence indicates the assaults occurred, could lead a reasonable jury to conclude that Ms. Faust in fact did see Mr. DeWitt's windows obstructed or saw Mr. DeWitt sexually assaulting inmates and did nothing about it.  This inference, combined with all record evidence before the Court including but not limited to the record evidence that Ms. Faust was aware that female inmates were sometimes alone with Mr. DeWitt in his office, could lead a reasonable jury to conclude that Ms. Faust was deliberately indifferent to the substantial risk of serious harm posed by Mr. DeWitt.  The Court denies ADC Defendants' motion for summary judgment with regard to Ms. Arnett's claim for failure to protect against Ms. Faust.

### f.      Failure To Protect Claim Against Christopher Budnik

Christopher Budnik has been employed by the ADC for approximately 20 years and was a Deputy Warden at McPherson from June 2014 through August 2015 (Dkt. No. 49, ¶ 10).  In that position, he was the Deputy Warden over security, classification, and field operations (Dkt. No. 48-7, at 16:14–22).  Mr. Budnik testified that PREA windows cannot be obscured, but non-PREA windows can (*Id.*, at 31:14–17).  Mr. Budnik testified that, even if a non-PREA window was completely covered, he would not do anything about it and that this is consistent with ADC policy (*Id.*, at 32:6–33:4).  Mr. Budnik testified that he was not aware of any policy that distinguishes PREA windows and non-PREA windows (*Id.*, at 31:6–9).  Mr. Budnik testified that he does not "see the relation between a covered window and something bad happening, when you have the

other window clear." (Dkt. No. 49, ¶¶ 105, 106).  Mr. Budnik testified that he never observed Mr. DeWitt's PREA window to be obscured (Dkt. No. 48-7, at 37:8–12).  Mr. Budnik testified that he could not recall if he ever noticed Mr. DeWitt's non-PREA window obscured (*Id.*).  Mr. Budnik testified that, when he was Deputy Warden, he would walk rounds that would take him by Mr. DeWitt's office (*Id.*).

Mr. Budnik's office at McPherson was on the same hallway as Mr. DeWitt's office (Dkt. No. 49, ¶ 173).  Mr. Budnik testified that his office was "fifty paces" away from Mr. DeWitt's office (Dkt. No. 48-7, at 12:14–16).  ADC Defendants state that, as Deputy Warden, Mr. Budnik regularly conducted rounds looking for issues in the facility (Dkt. No. 49, ¶ 175).

Ms. Arnett testified that Mr. Budnik was sometimes in the hallway when Mr. DeWitt would ask for her to be in his office (Dkt. No. 48-1, at 193:18–22).  Ms. Arnett testified that, on one occasion, Mr. Budnik walked in while Mr. DeWitt was sexually abusing her and while Mr. DeWitt was adjusting his pants and acting strangely (*Id.*, at 193:25–195:12).

Viewing the record evidence in the light most favorable to the nonmoving party Ms. Arnett, a reasonable jury could conclude that Mr. Budnik saw both Mr. DeWitt's PREA and non-PREA windows obstructed and that Mr. Budnik had seen Mr. DeWitt at a minimum alone with Ms. Arnett in his office adjusting his pants and acting strangely or had seen Mr. DeWitt sexually abusing Ms. Arnett.  Based on this record evidence and the reasonable inferences drawn from it in favor of Ms. Arnett, a reasonable jury could decide that Mr. Budnik was deliberately indifferent to a substantial risk of harm to Ms. Arnett.  The Court denies ADC Defendants' motion for summary judgment with regard to Ms. Arnett's claim for failure to protect against Mr. Budnik.

### g.     Failure To Protect Claim Against Linda Dykes

Linda Dykes began working for the ADC in 2001 as a Sergeant at McPherson, was a Lieutenant at McPherson from 2009 to 2010, a Captain at McPherson from 2010 to February 2017, and a Deputy Warden at McPherson from February 2017 through June 2017 (Dkt. No. 49, ¶ 9). Ms. Dykes testified that, as a Captain at McPherson from 2010 to 2014, she made rounds covering the entire facility, including the hallway in front of Mr. DeWitt's office, daily (Dkt. No. 48-8, at 16:9–19:8). Sometimes she would do these round several times per day (*Id.*). In this role, Ms. Dykes was charged with performing routine safety checks of doors, windows, and alarm systems regularly (*Id.*, at 14:8–21). Additionally, Ms. Dykes was one of the staff members responsible for making sure staff office windows were not covered or obstructed in compliance with PREA and prison policy (*Id.*, at 20:15–21:8).

Ms. Dykes testified that, according to prison policy, PREA windows had to be completely uncovered, but it would not have concerned her if a non-PREA window was obscured, even if a male staff member often met with female inmates in that office (*Id.*, at 21:15–24:23). Ms. Dykes testified that, if she was told ADC policy made no distinction between PREA and non-PREA windows, she could not refute the statement (*Id.*, at 26:3–14). There is record evidence that when Mr. DeWitt sexually assaulted Ms. Arnett and his other victims, he obscured the view through both the PREA and non-PREA windows in his office (Dkt. No. 48-2, at 47:20–48:7).

Viewing the record evidence in the light most favorable to the nonmoving party Ms. Arnett, a reasonable jury could conclude that when making her rounds Ms. Dykes had seen Mr. DeWitt's windows obscured, and based on this conclusion could decide the Ms. Dykes was deliberately indifferent to the unreasonable risk of harm Mr. DeWitt posted to Ms. Arnett. The Court denies ADC Defendants motion for summary judgment with regard to Ms. Arnett's claim for failure to protect against Ms. Dykes.

67

### C.    Failure To Supervise Claims

#### 1.    Legal Standard

The law is clear that *respondeat superior* is not a recognized basis for § 1983 liability. *See Keeper v. King*, 130 F.3d 1309 (8th Cir. 1997).   To state a cognizable claim against a defendant in a supervisory role, an inmate must allege that the defendant was personally involved in the constitutional violation or became aware of the constitutional violation and, with deliberate indifference, failed to take corrective action.  *See, e.g., Choate v. Lockhart*, 7 F.3d 1370, 1376 (8th Cir. 1993).  In other words, to impose individual liability a plaintiff must show "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009)).

To assert a constitutional violation based on a defendant's failure to supervise staff, when the supervisor had no direct participation in the alleged unconstitutional violation and is sued for failure to train or supervise the unconstitutional actor, a plaintiff must show that the supervisor: (1) received notice of a pattern of unconstitutional acts committed by subordinates; (2) demonstrated deliberate indifference to or tacit authorization of the offensive acts; (3) failed to take sufficient remedial action; and (4) that such failure proximately caused injury to plaintiff.  *See Parrish*, 594 F.3d at 1002; *see also S.M. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015); *see also Walton v. Dawson*, 752 F.3d 1109 (8th Cir. 2014) (applying *Farmer v. Brennan*, 511 U.S. 825, 837 (1994), to a Fourteenth Amendment claim).  This standard requires proof that the supervisor had notice of a pattern of conduct by the subordinate that violated a clearly established constitutional right, and allegations of generalized notice are insufficient.  *Krigbaum*, 808 F.3d at 340.  "'The supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he or she] might see.'" *Ripson v. Alles*, 21 F.3d 805, 809 (8th Cir.1994) (quoting

*Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir.1988)). "To impose supervisory liability, other misconduct must be very similar to the conduct giving rise to liability." *Krigbaum*, 808 F.3d at 340.

### 2.   Analysis

Based on the record evidence before the Court, and viewing the record evidence in the light most favorable to the nonmoving party Ms. Arnett, there is a genuine issue of material fact in dispute regarding whether certain ADC Defendants—Ms. Faust, Mr. Budnik, and Ms. Dykes— received notice of a pattern of unconstitutional acts committed by Mr. DeWitt pertaining to conduct similar to the conduct giving rise to liability here. Even viewing the record evidence in the light most favorable to Ms. Arnett, this Court determines that there is no genuine issue of material fact in dispute regarding whether the remaining ADC Defendants—Mr. Norris, Mr. Hobbs, and Ms. Kelley—received notice of a pattern of unconstitutional acts committed by Mr. DeWitt pertaining to conduct similar to the conduct giving rise to liability here. In reaching these conclusions, the Court relies upon its analysis with respect to Ms. Arnett's failure to protect claims.

The Court then turns to the question of who had authority to supervise Mr. DeWitt. ADC Defendants assert that there is undisputed record evidence that, as a unit chaplain, Mr. DeWitt reported to the Administrator of Religious Services (Dkt. No. 49, ¶ 17). The Administrator of Religious Services reported to the Deputy Director for Health and Correctional Programs (*Id.*). ADC Defendants rely on this assertion to maintain summary judgment should be entered in their favor on Ms. Arnett's failure to supervise claim.

However, as discussed previously in this Order, the record evidence is less than clear on whether others had responsibility or authority at various times to supervise Mr. DeWitt. There is record evidence that chaplains are subordinates of Deputy Wardens and that Deputy Wardens may

give chaplains orders regarding security issues (Dkt. No. 48-7, at 17:21–23, 18:16–25).  There is record evidence that, when Ms. Faust was a Deputy Warden at McPherson from 2014 to 2015, she oversaw the prison chaplaincy program (Dkt. No. 48-7, at 16:25–17:4).  There is record evidence that it was Ms. Faust's responsibility to monitor prison chaplains during that time (Dkt. No. 48-6, at 114:4–17; 127:6–7).  Further, Mr. Budnik has been employed by the ADC for approximately 20 years and was a Deputy Warden at McPherson from June 2014 through August 2015 (Dkt. No. 49, ¶ 10).  In that position, he was the Deputy Warden over security, classification, and field operations (Dkt. No. 48-7, at 16:14–22).  Based on the record evidence construed in the light most favorable to Ms. Arnett, a reasonable jury could conclude that Ms. Faust and Mr. Budnik had authority to give Mr. DeWitt orders regarding security issues and to supervise him.  However, there is no record evidence that Ms. Dykes had the authority to give Mr. DeWitt orders or to supervise him.

For these reasons, the Court denies summary judgment to Ms. Faust and Mr. Budnik on Ms. Arnett's failure to supervise claim and grants summary judgment to Ms. Dykes, Mr. Norris, Mr. Hobbs, and Ms. Kelley on Ms. Arnett's failure to supervise claim.

### D.     Retaliation Claims

Ms. Arnett's brings claims for retaliation in violation of the Eighth and Fourteenth Amendments against all defendants (Dkt. No. 1, ¶¶ 210–219).  However, the Eighth and Fourteenth Amendments do not provide a basis for retaliation claims.  The First Amendment does, and Ms. Arnett does not cite the First Amendment in her complaint (Dkt. No. 1).  Because the parties address this claim in their filings, the Court will examine this claim.

### 1.     Legal Standard

"[A]s a general matter, the First Amendment prohibits government officials from subjecting individuals to retaliatory actions after the fact for having engaged in protected speech." *Aldridge v. City of St. Louis*, 75 F.4th 895, 898 (8th Cir. 2023) (internal quotations omitted) (quoting Houston *Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1259 (2022); *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019)).  To prevail on a First Amendment retaliation claim, a plaintiff must first show that they engaged in protected activity.  *Aldridge*, 75 F.4th at 898.  "If they can make that showing, then the focus shifts to whether the officers 'took [an] adverse action . . . that would chill a person of ordinary firmness from continuing in the [protected] activity.'"  *Molina v. City of St. Louis*, 59 F.4th 334, 338 (8th Cir. 2023) (alterations in original) (quoting *Hoyland v. McMenomy*, 869 F.3d 644, 655 (8th Cir. 2017), *abrogated on other grounds by Nieves*, 139 S. Ct. at 1722).  Finally, "the plaintiff must show that the defendant would not have taken the adverse action but for harboring 'retaliatory animus' against the plaintiff because of his exercise of his First Amendment rights."  *Mitchell v. Kirchmeier*, 28 F.4th 888, 896 (8th Cir. 2022) (quoting *Nieves*, 139 S. Ct. at 1722).

The Eighth Circuit has "repeatedly held that '[t]he filing of a prison grievance, like the filing of an inmate lawsuit, is protected First Amendment activity.'"  *Gonzalez v. Bendt*, 971 F.3d 742, 744–45 (8th Cir. 2020) (alteration in original) (quoting *Lewis v. Jacks*, 486 F.3d 1025, 1029 (8th Cir. 2007)).  Actions taken in retaliation for such filings are therefore actionable under 42 U.S.C. § 1983.  *Id.*, at 745.

### 2.    Analysis

The parties dispute which ADC defendants Ms. Arnett believes retaliated against her.  Ms. Arnett's complaint brought the retaliation claim against all defendants (Dkt. No. 1, at 40).  However, of the six ADC Defendants, Ms. Arnett admitted in response to ADC Defendants'

requests for admission that five of them did not engage in retaliation against her:  Larry Norris, Ray Hobbs, Wendy Kelley, Christopher Budnik, and Linda Dykes (Dkt. No. 38-37, at 4–5).  When deposed, Ms. Arnett confirmed that Mr. Norris, Mr. Hobbs, Ms. Kelly, and Mr. Budnik did not retaliate against her (Dkt. No. 38-11, at 131:17–132:14).  However, with regard to Ms. Dykes, Ms. Arnett clarified that her position is that Ms. Dykes knew Ms. Arnett was being retaliated against but did not do anything about it (*Id.*, at 132:15–134:16).  The Court agrees with ADC Defendants that Ms. Arnett is not permitted now, having testified under oath and in response to a written request for admission, to change her mind with respect to the scope of her retaliation claims, especially not on the record evidence before the Court.  Further, Ms. Arnett's position with respect to Ms. Dykes does not suffice to state an actionable retaliation claim under controlling Eighth Circuit case law.  ADC Defendants Mr. Norris, Mr. Hobbs, Ms. Kelley, Mr. Budnik, and Ms. Dykes are entitled to summary judgment on Ms. Arnett's retaliation claim.

That leaves Ms. Arnett's allegations of retaliation against Ms. Faust.  ADC Defendants understand these to be Ms. Arnett's retaliation claims:  (1) claims against Ms. Faust between the dates of July of 2020, when Ms. Faust returned to McPherson, and May 4, 2021, when Ms. Arnett refiled her complaint; (2) the Unit Classification Committee's removal of Ms. Arnett from PAL in 2016, which Ms. Arnett alleges was because of a Memorandum to her from Mr. Yancy dated January 21, 2015; (3) Ms. Faust's removal of Ms. Arnett from the Paws in Prison Program after the filing of the present lawsuit; (4) the allowance by non-party unnamed ADC personnel allowing Mr. Dewitt's family members to continue working in PAL; and (5) Jennifer Smith's purportedly retaliating against Ms. Arnett and applying pressure on Ms. Arnett not to file a grievance based upon the Dewitt family (Dkt. No. 50, at 22).

To the extent that Ms. Arnett maintains that Ms. Faust prevented her from completing her written statement on December 29, 2014, Ms. Arnett fails to demonstrate that this action would chill a person of ordinary firmness in continuing to exercise their First Amendment rights and that this action was taken by Ms. Faust due to "retaliatory animus" against Ms. Arnett because of the exercise of her First Amendment rights.  Record evidence supports that, on December 18, 2014, former McPherson inmate-turned-prison volunteer, Jennifer Smith, became aware that Mr. DeWitt had been sexually abusing three inmates for an extended period of time and that she waited two days before telling supervisor Mr. Yancey by email (Dkt. No. 48-10, at 10–12).  Mr. Yancey waited an additional day before notifying his religious services superior, Joshua Mayfield, and another chaplain, John Mark Wheeler, on December 21, 2014 (*Id.*, at 9–10).  Later that day, Mr. Mayfield contacted the acting Warden, Jimmy Banks, about the situation (*Id.*, at 9).  On December 22, 2014, Mr. Yancey emailed Jennifer Smith, finally identifying the allegations as a clear PREA issue and telling her to expect an investigation to begin possibly that day (*Id.*, at 10).  Ms. Kelley learned about the allegations against Mr. DeWitt on December 20, 21 or 22 (*Id.*, at 13).  Raymond Naylor, ADC Internal Affairs ("IA") administrator, learned of the allegations on December 22, 2014 (*Id.*). After yet another day of inaction, Mr. Naylor says to Mr. Mayfield, "Lets send this to state police for prosecution."  (*Id.*).

In an affidavit in support of ADC Defendants' motion, ASP investigator, Mike Grimes, claims he became aware of the allegations against Mr. DeWitt in December 2014 (Dkt. No. 38-16, ¶ 3).  However, there is no objective evidence of this.  Instead, there is a January 8, 2015, ADC memo from Naylor referring the DeWitt allegations to ASP (Dkt. No. 48-31).

Record evidence supports that, on December 29, 2014, Ms. Arnett went to the warden's office to draft a witness statement detailing the years of sexual abuse she suffered at the hands of

Mr. DeWitt (Dkt. No. 48-1, at 72:21–73:4).  However, in the middle of drafting the statement, Ms. Faust ordered Ms. Arnett to stop immediately writing and sent her back to her barracks (*Id.*; *see also* Dkt. Nos. 48-6, at 155:25–156:16; 48-32, at 3).  Ms. Faust claims that Mr. Naylor instructed her to terminate the investigation, mentioning a concern about the statements being used in criminal court (Dkt. No. 48-6, at 156:2–16).  Although Mr. Naylor told Ms. Faust that he was getting the ASP to investigate (Dkt. No. 48-6, at 156:9–10), there is no objective record evidence of Mr. Naylor formally contacting the ASP until January 8, 2015, more than a week later (Dkt. No. 48-31).  Again, even if true, Ms. Arnett fails to demonstrate that this action would chill a person of ordinary firmness in continuing to exercise their First Amendment rights and that this action was taken by Ms. Faust due to "retaliatory animus" against Ms. Arnett because of the exercise of her First Amendment rights.  Further, the ASP did investigate, and Mr. DeWitt was criminally prosecuted for his conduct.

To the extent Ms. Arnett alleges that when Ms. Faust returned to McPherson in July 2020 Ms. Faust began retaliating against Ms. Arnett by finding Ms. Arnett's grievances without merit, this Court agrees that this claim fails because circuit courts, including the Eighth Circuit, have held that the denial of grievances is not an adverse action for retaliation purposes.  *Gonzalez*, 971 F.3d at, 745.  Further, Ms. Arnett presents insufficient record evidence that Ms. Faust's alleged action chilled Ms. Arnett's speech.

Ms. Arnett next alleges the McPherson Classification Committee removed her from PAL in 2016 allegedly because of a Memorandum to Ms. Arnett from Mr. Yancey dated January 21, 2015 (Dkt. No. 48-28).  Mr. Yancey is not a defendant in this litigation.  There is no record evidence to establish a connection between the January 2015 Memorandum and Ms. Arnett's July 2016 removal from the program.  There is no record evidence that Ms. Faust or any of the ADC

Defendants served on, or had influence over, the Classification Committee that removed Ms. Arnett from PAL in 2016.

Ms. Arnett alleges that her removal from the Paws in Prison Program after the re-filing of her complaint in this action was retaliation (Dkt. No. 48-1, at 238).  There is insufficient record evidence in support of this allegation to create a genuine issue of material fact regarding it.  Further, ADC Defendants maintain that Ms. Arnett cannot proceed on this claim as it is an unexhausted claim, given that the events about which Ms. Arnett complains occurred after the filing of the current lawsuit.  *See Booth v. Churner*, 532 U.S. 731, 739, 741 (2001); *see also Porter v. Nussle*, 534 U.S. 516 (2002) (prisoners who claim denial of their federal rights while incarcerated must meet 1997e(a)'s exhaustion requirement before commencing a civil rights action).  This Court agrees.

Next, Ms. Arnett complains that unnamed ADC personnel allowed Mr. Dewitt's family members to continue working in PAL sometime in 2015, many months after Mr. Dewitt resigned in September 2014.  The record evidence is that Mr. DeWitt was arrested in 2015 and charged with 50 counts of sexual assault.  Following Mr. DeWitt's arrest and criminal charging, his immediate family—his daughter, son and daughter-in-law—were allowed by McPherson to continue the PAL program previously run by Mr. DeWitt (Dkt. No. 48-11, at 9).  Ms. Arnett complained about being targeted for retaliation by Mr. DeWitt's son, daughter-in-law, and daughter, as well as by Jennifer Smith, who is a non-party to this case, before McPherson finally opened an investigation on Ms. Arnett's grievances in February 2016 (*Id.*, at 6).  The following month, an ADC investigator determined that "[e]x-employee Dewitt's family members should not have been allowed to volunteer at the facility" after his resignation and that "[a]llowing his family members to continue to visit the unit as well as to have any direct contact with the victim/s, we risk the possibility of

intimidation and the discussing of the prior incident between concerned parties." (*Id.*, at 5).  Mr. DeWitt's family and Jennifer Smith were barred from entering McPherson on February 7, 2016 (*Id.* at 14).  Ms. Arnett does not identify anyone who permitted this conduct by the DeWitt family, and Ms. Arnett does not present sufficient record evidence to tie this decision to Ms. Faust in any way so as to support a retaliation claim against Ms. Faust.

Ms. Arnett's last retaliation claim is against Ms. Smith.  There is no record evidence before the court that Ms. Arnett informed any of the ADC Defendants about the alleged actions of Ms. Smith.

For all of these reasons, the Court grants Ms. Faust, and all ADC Defendants, summary judgment in their favor on Ms. Arnett's retaliation claims.

### E.   Conspiracy Claims

Ms. Arnett brings her claim for civil conspiracy against all ADC Defendants under 42 U.S.C. § 1985 (Dkt. No. 1, at 44).  Specifically, Ms. Arnett must intend to refer to § 1985(3), as that is the only provision of § 1985 that governs civil conspiracies.  42 U.S.C. § 1985.  Section 1985(3) provides a cause of action for conspiracies to deprive "any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws."  42 U.S.C. § 1985(3).  Ms. Arnett alleges an underlying Eighth Amendment violation (Dkt. No. 1).  Although Ms. Arnett cites the Fourteenth Amendment generally, she makes no arguments in her complaint, and she makes no argument in response to ADC Defendants motion for summary judgment, based on the equal protection of the laws or that refer to equality or differential treatment that could conceivably fall under § 1985(3) (Dkt. No. 48).  Ms. Arnett briefly alludes, without citation, to the claim that "[a]s a female rape victim, [she] is a member of a protected class" (Dkt. No. 48, at 39).  However, she does not argue that she was treated unequally due to her status as a member of such

a class (*Id.*).  Without an underlying equality-based claim, Ms. Arnett's § 1985 claim for civil conspiracy cannot succeed, and ADC defendants are entitled to summary judgment.

Furthermore, had Ms. Arnett brought this civil conspiracy claim against ADC Defendants under 42 U.S.C. § 1983 rather than § 1985, it would still not succeed.  To state a claim for conspiracy under 42 U.S.C. § 1983, the "plaintiff must show:  (1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff."  *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008) (citing *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999)).  The first element "requires allegations of specific facts tending to show 'meeting of the minds' among the alleged conspirators."  *Murray v. Lene*, 595 F.3d 868, 870 (8th Cir. 2010) (citing *Kearse v. Moffett*, 311 F.3d 891, 892 (8th Cir. 2002) (per curiam).

ADC Defendants would be entitled to qualified immunity on the 42 U.S.C. § 1983 conspiracy claim because the law on the intracorporate conspiracy doctrine is not clearly established as it applies to § 1983 claims.  The intracorporate conspiracy doctrine "allows corporate agents acting within the scope of their employment to be shielded from constituting a conspiracy under § 1985."  *Meyers v. Starke*, 420 F.3d 738, 742 (8th Cir. 2005) (citing *Cross v. Gen. Motors Corp.*, 721 F.2d 1152, 1156 (8th Cir. 1983)).  The rule derives from the nature of conspiracy, which requires an agreement between or among two or more separate persons.  This argument stems from *Ziglar v. Abbasi*, which held that officials were entitled to qualified immunity on § 1985 conspiracy claims because the lower courts were divided on the applicability of the intracorporate conspiracy doctrine in § 1985 cases.  *Ziglar v. Abbasi*, 582 U.S. 120 (2017).

In *Baude v. City of St. Louis*, 476 F. Supp. 3d 900, 915–16 (E.D. Mo. 2020), *aff'd sub nom.*
*Baude v. Leyshock*, 23 F.4th 1065 (8th Cir. 2022), the court determined that, in the light of this
landscape, it cannot be said that the law regarding the application of the intracorporate conspiracy
doctrine in § 1983 cases is clearly established.  Similarly, in *Street v. Leyshock*, 41 F.4th 987, 990
(8th Cir. 2022), the Eighth Circuit Court of Appeals reached the same conclusion granting
defendants qualified immunity on the plaintiffs' conspiracy claims because the unsettled nature of
the intracorporate conspiracy doctrine meant that defendants did not violate a clearly established
right.  *See also Torres v. City of St. Louis*, 39 F.4th 494, 507 (8th Cir. 2022), *reh'g denied*, Case
No. 21-1761, 2022 WL 3151858 (8th Cir. Aug. 8, 2022) (same).

For all of these reasons, ADC Defendants are entitled to summary judgment on Ms.
Arnett's civil conspiracy claim.

## V.        Conclusion

The Court grants, in part, and denies, in part, ADC Defendants' motion for summary
judgment (Dkt. No. 38).  Specifically, the Court denies ADC Defendants' motion for summary
judgment as to Ms. Faust, Mr. Budnik, and Ms. Dykes on Ms. Arnett's failure to protect claim.
The Court grants summary judgment to Mr. Norris, Mr. Hobbs, and Ms. Kelley on Ms. Arnett's
failure to protect claim.  The Court denies ADC Defendants' motion for summary judgment as to
Ms. Faust and Mr. Budnik on Ms. Arnett's failure to supervise claim.  The Court grants summary
judgment to Ms. Dykes, Mr. Norris, Mr. Hobbs, and Ms. Kelley on Ms. Arnett's failure to
supervise claim.  The grants ADC Defendants' motion for summary judgment in favor of ADC
Defendants on Ms. Arnett's retaliation claim and conspiracy claim.

It is so ordered this 30th day of September, 2024.

*Kristine G. Baker*

Kristine G. Baker
Chief United States District Judge